# TOOMER ET AL. *v.* WITSELL ET AL.

No. 415.   Argued January 13–14, 1948.—Decided June 7, 1948.

*Aaron Kravitch* and *Robert E. Falligant* argued the cause for appellants. With them on the brief were *Phyllis Kravitch* and *John J. Bouhan.*

*J. Monroe Fulmer,* Assistant Attorney General of South Carolina, and *David W. Robinson* argued the cause for appellees. With them on the brief were *John M. Daniel,* Attorney General, *T. C. Callison,* Assistant Attorney General, and *James F. Dreher.*

MR. CHIEF JUSTICE VINSON delivered the opinion of the Court.

This is a suit to enjoin as unconstitutional the enforcement of several South Carolina statutes governing commercial shrimp fishing in the three-mile maritime belt off the coast of that State. Appellants, who initiated the action, are five individual fishermen, all citizens and residents of Georgia, and a non-profit fish dealers' organization incorporated in Florida. Appellees are South Carolina officials charged with enforcement of the statutes.

The three-judge Federal District Court which was convened to hear the case [1] upheld the statutes, denied an injunction and dismissed the suit.[2] On direct appeal from that judgment [3] we noted probable jurisdiction.

The fishery which South Carolina attempts to regulate by the statutes in question is part of a larger shrimp fishery extending from North Carolina to Florida.[4] Most of

---

[1] The court was convened pursuant to § 266 of the Judicial Code, 28 U. S. C. § 380.

[2] 73 F. Supp. 371 (1947).

[3] The appeal is authorized by § 266 of the Judicial Code, 28 U. S. C. § 380.

[4] See Johnson and Lindner, *Shrimp Industry of the South Atlantic and Gulf States* (U. S. Dept. of Commerce, Bureau of Fisheries Investigational Rep. No. 21, 1934); Annual Rep. of S. C. State Board of Fisheries (1946).

the shrimp in this area are of a migratory type, swimming south in the late summer and fall and returning northward in the spring. Since there is no federal regulation of the fishery, the four States most intimately concerned have gone their separate ways in devising conservation and other regulatory measures. While action by the States has followed somewhat parallel lines, efforts to secure uniformity throughout the fishery have by and large been fruitless.[5] Because of the integral nature of the fishery, many commercial shrimpers, including the appellants, would like to start trawling off the Carolinas in the summer and then follow the shrimp down the coast to Florida. Each State has been desirous of securing for its residents the opportunity to shrimp in this way, but some have apparently been more concerned with channeling to their own residents the business derived from local waters. Restrictions on non-resident fishing in the marginal sea, and even prohibitions against it, have now invited retaliation to the point that the fishery is effectively partitioned at the state lines; bilateral bargaining on an official level has come to be the only method whereby any one of the States can obtain for its citizens the right to shrimp in waters adjacent to the other States.[6]

---

[5] At least three of the States (Florida, Georgia, and South Carolina) belong to the Atlantic States Marine Fisheries Commission, one of the principal aims of which is to secure the enactment of uniform fisheries laws. The Commission was established pursuant to an interstate compact which has been ratified by at least thirteen eastern States. Its duties, however, are largely consultive and advisory, and to date its efforts have produced little in the way of concrete results insofar as the South Atlantic shrimp fishery is concerned. See 56 Stat. 267 (1942); Fla. Stat. Ann. § 374.43 (Supp. 1946); Ga. Code Ann. § 45–1001 *et seq.* (Supp. 1947); S. C. Code Ann. (1944 Supp.) § 1776–1; Annual Rep. of the S. C. State Board of Fisheries (1943); *id.* (1944); *id.* (1945); *id.* (1946).

[6] See Fla. Stat. Ann. § 374.14 (3) (Supp. 1946), as amended by 1947 Gen. Laws of Fla., Act 163; Ga. Code Ann. §§ 45–216, 45–217 (1937); N. C. Gen. Stat. Ann. § 113–238, as amended 1947 Session

South Carolina forbids trawling for shrimp in the State's inland waters,[7] which are the habitat of the young shrimp for the first few months of their life. It also provides for a closed season in the three-mile maritime belt during the spawning season, from March 1 to July 1.[8] The validity of these regulations is not questioned.

The statutes appellants challenge relate to shrimping during the open season in the three-mile belt: Section 3300 of the South Carolina Code provides that the waters in that area shall be "a common for the people of the State for the taking of fish."[9] Section 3374 imposes a tax of $\frac{1}{8}$¢ a pound on green, or raw, shrimp taken in those waters.[10] Section 3379, as amended in 1947, requires payment of a license fee of $25 for each shrimp boat owned by a resident, and of $2,500 for each one owned by a non-resident.[11] Another statute, not integrated in

Laws of N. C., c. 256; S. C. Acts of 1947, Act 281, §§ 1, 2, 5. See also statements by the S. C. State Planning Board that "In revising these [shrimp] laws . . . non-resident licenses [should be] placed on a par or reciprocal basis with those of other states in the South Atlantic group" and "Under existing regulations our fishermen are discriminated against." S. C. State Planning Board Bull. No. 14, p. 59 (1944).

[7] S. C. Code Ann. § 3410 (Supp. 1944).

[8] S. C. Code Ann. § 3408.

[9] "The waters and bottoms of the bays, rivers, creeks and marshes within the State or within three miles of any point along low water mark on the coast thereof, not heretofore conveyed by grant from the Legislature or lawful compact with the State, shall continue and remain as a common for the people of the State for the taking of fish . . . ."

[10] "The following fisheries' tax is hereby imposed upon all fish or fisheries products taken or canned, shucked or shipped for market, to-wit . . . on each pound of green shrimp, one-eighth of one cent. . . ."

[11] Prior to 1947 there was imposed on resident and non-resident shrimpers alike a boat tax of $1.50 per ton; a personal license tax of $5; and a tax of $5 for each shrimp trawl net. S. C. Code Ann. §§ 3375, 3376, 3379. These taxes, with the possible exception of

the Code, conditions the issuance of non-resident licenses for 1948 and the years thereafter on submission of proof that the applicants have paid South Carolina income taxes on all profits from operations in that State during the preceding year.[12]   And § 3414 requires that all boats

---

§ 3375 imposing a boat tax graduated by tonnage, apparently remain in effect and, in addition, § 3379 was amended as follows:

". . . All owners of shrimp boats, who are residents of the State of South Carolina shall take out a license for each boat owned by him, and said license shall be Twenty-five ($25.00) dollars per year, and all owners of shrimp boats who are non-residents of the State of South Carolina, and who have had one or more boats licensed in South Carolina during each of the past three years, shall take out a license for each boat owned by him and said license shall be One hundred and fifty ($150.00) dollars per year, and all owners of shrimp boats who are non-residents of the State of South Carolina and who have not had one or more boats licensed during each of the past three years, shall take out a license for each boat owned by him and said license shall be Two thousand five hundred ($2,500.00) dollars per year."   S. C. Acts of 1947, Act 281, § 1.

The appellants cannot qualify for $150 licenses and hence are subject to the $2,500 provision. As introduced in the legislature and passed by the South Carolina House of Representatives, the bill to amend § 3379 did not contain the $150 provision. That provision was inserted by amendment in the Senate at the instance of a senator from Beaufort County, which is the coastal county adjoining Georgia. See House Bill 555; Senate Bill 576; Senate Journal No. 69, May 9, 1947, pp. 53–5; Charleston News and Courier, May 17, 1947, p. 1, cols. 2–3.

Other parts of the same 1947 statute, not attacked in this case, limit to 100 the number of non-resident boats which may be licensed and forbid altogether the issuance of licenses, even on payment of the $2,500 fee, to residents of States which do not grant licenses to fish in their waters to South Carolina residents at the same or a lower fee.   Id. §§ 2, 5.

[12] "The Board of Fisheries, before issuing any non-resident licenses in the year 1948 and thereafter, shall require proof that the owner of the non-resident boat has paid all income taxes due to the State of South Carolina for profits made from operations in South Carolina during the preceding year."   Id. § 3.

licensed to trawl for shrimp in the State's waters dock at a South Carolina port and unload, pack, and stamp their catch "before shipping or transporting it to another State or the waters thereof." [13] Violation of the fishing laws entails suspension of the violator's license as well as a maximum of a $1,000 fine, imprisonment for a year, or a combination of a $500 fine and a year's imprisonment.[14]

*First.* We are confronted at the outset with appellees' contention, rejected by the District Court, that injunctive relief is inappropriate in this case, regardless of the validity of the challenged statutes, since appellants failed to show the imminence of irreparable injury and did not come into court with clean hands.

As to the corporate appellant, we agree with the appellees that there has been no showing that enforcement of the statutes would work an irreparable injury. The record shows only that the corporation is an association of fish dealers and that it operates no fishing boats. Indeed, neither the record nor the appellants' brief sheds any light on how the statutes affect the corporation, let alone how their enforcement will cause it irreparable injury. Under such circumstances, the corporation has no standing to ask a federal court to take the extraordinary step of restraining enforcement of the state statutes. The remainder of this opinion will therefore be addressed to the individual appellants' case.

As to them, it is agreed that the appellees were attempting to enforce the statutes. It is also clear that compliance with any but the income tax statute would have

---

[13] "All boats licensed by this State to trawl for shrimp in the waters of the State of South Carolina shall land or dock at some point in South Carolina, and shall unload their catch of shrimp, and pack and properly stamp the same before shipping or transporting it to another State or the waters thereof. . . ." The stamping refers to tax stamps.

[14] S. C. Acts of 1947, Act 281, § 4; S. C. Code Ann. §§ 3407, 3414.

required payment of large sums of money for which South Carolina provides no means of recovery, that defiance would have carried with it the risk of heavy fines and long imprisonment, and that withdrawal from further fishing until a test case had been taken through the South Carolina courts and perhaps to this Court would have resulted in a substantial loss of business for which no compensation could be obtained. Except as to the income tax statute, we conclude that appellants sufficiently showed the imminence of irreparable injury for which there was no plain, adequate and complete remedy at law.[15]

Appellants' position on the income tax statute [16] is that it is unconstitutional for South Carolina to require Georgia residents to pay South Carolina income taxes on profits made from operations in South Carolina waters. Another South Carolina statute, however, permits any taxpayer who believes a tax to be "illegal for any cause" to pay the tax under protest and then sue in a state court to recover the amounts so paid.[17] In the absence of any showing by appellants that they could not take advantage of this procedure to raise their constitutional objections to the tax, we cannot say that they do not have an adequate remedy at law.

---

[15] Appellees stress *American Federation of Labor* v. *Watson*, 327 U. S. 582 (1946). We think the doctrine of that case applicable to one of the arguments made against § 3374, *supra* note 10. See the third division of this opinion, *infra* p. 394. As to all the other statutes except that relating to state income taxes, however, we agree with the District Court that there is neither need for interpretation of the statutes nor any other special circumstance requiring the federal court to stay action pending proceedings in the State courts.

[16] See note 12 *supra*.

[17] S. C. Code Ann. § 2469. This section provides that a taxpayer may institute suit to recover the amounts paid within thirty days of the payment under protest. See *Argent Lumber Co.* v. *Query*, 178 S. C. 1, 5, 182 S. E. 93, 94 (1935).

Some of the individual appellants had previously been convicted of shrimping out of season and in inland waters. The District Court held that this previous misconduct, not having any relation to the constitutionality of the challenged statutes, did not call for application of the clean hands maxim. ˙ We agree.

*Second.* The appellants too press a contention which, if correct, would dispose of the case. They urge that South Carolina has no jurisdiction over coastal waters beyond the low-water mark. In the court below *United States* v. *California,* 332 U. S. 19 (1947), was relied upon for this proposition. Here appellants seem to concede, and correctly so, that such is neither the holding nor the implication of that case; for in deciding that the United States, where it asserted its claim, had paramount rights in the three-mile belt, the Court pointedly quoted and supplied emphasis to a statement in *Skiriotes* v. *Florida,* 313 U. S. 69, 75 (1941), that "It is also clear that Florida has an interest in the proper maintenance of the sponge fishery and that the [state] statute *so far as applied to conduct within the territorial waters of Florida, in the absence of conflicting federal legislation, is within the police power of the State."* [18]

Since the present case evinces no conflict between South Carolina's regulatory scheme and any assertion of federal power, the District Court properly concluded that the State has sufficient interests in the shrimp fishery within three miles of its coast so that it may exercise its police power to protect and regulate that fishery.[19]

---

[18] 332 U. S. 19, 38 (1947).

[19] Appellants also contend that until 1924 South Carolina had itself limited its boundaries by the low-water mark and had asserted no power over the maritime belt. But, as the District Court held, the statute cited by appellants need not be given the effect which they would attribute to it, and even if it were so construed, it did not impose a constitutional limit on the power of future legislatures.

It does not follow from the existence of power to regulate, however, that such power need not be exercised within the confines of generally applicable Constitutional limitations. In the view we take, the heart of this case is whether South Carolina's admitted power has been so exercised. We now proceed to various aspects of that problem.

*Third.* Appellants contend that § 3374,[20] which imposes a tax of $\frac{1}{8}$¢ a pound on green shrimp taken in the maritime belt, taxes imports and unduly burdens interstate commerce in violation of §§ 8 and 10 of Art. I of the Constitution. We agree with the court below that there is no merit in this position.

Since South Carolina has power to regulate fishing in the three-mile belt, at least where the federal government has made no conflicting assertion of power, fish caught in that belt cannot be considered "imports" in a realistic sense of the word. Appellants urge, however, that the tax is imposed on shrimp caught outside, as well as within, the three-mile limit. On its face the statute has no such effect, and appellants call our attention to no South Carolina decision so interpreting it. Since we do not have the benefit of interpretation by the State courts and since this suit for an injunction does not present a concrete factual situation involving the application of the statute to shrimping beyond the imaginary three-mile line, it is inappropriate for us to rule in the abstract on the extent of the State's power to tax in this regard.[21]

Nor does the statute violate the commerce clause. It does not discriminate against interstate commerce in shrimp, and the taxable event, the taking of shrimp,

---

[20] See note 10 *supra.*

[21] See *American Federation of Labor* v. *Watson,* 327 U. S. 582 (1946); cf. *Rescue Army* v. *Municipal Court,* 331 U. S. 549 (1947).

occurs before the shrimp can be said to have entered the flow of interstate commerce.[22]

*Fourth.* Appellants' most vigorous attack is directed at § 3379 [23] which, as amended in 1947, requires non-residents of South Carolina to pay license fees one hundred times as great as those which residents must pay. The purpose and effect of this statute, they contend, is not to conserve shrimp, but to exclude non-residents and thereby create a commercial monopoly for South Carolina residents. As such, the statute is said to violate the privileges and immunities clause of Art. IV, § 2, of the Constitution and the equal protection clause of the Fourteenth Amendment.

Article IV, § 2, so far as relevant, reads as follows:

> "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

The primary purpose of this clause, like the clauses between which it is located—those relating to full faith and credit and to interstate extradition of fugitives from justice—was to help fuse into one Nation a collection of independent, sovereign States. It was designed to insure to a citizen of State A who ventures into State B the same privileges which the citizens of State B enjoy.[24] For protection of such equality the citizen of State A was not to be restricted to the uncertain remedies afforded by diplomatic processes and official retaliation.[25]

---

[22] See *Hope Natural Gas Co.* v. *Hall,* 274 U. S. 284 (1927); *Lacoste* v. *Dept. of Conservation,* 263 U. S. 545 (1924); *Oliver Iron Co.* v. *Lord,* 262 U. S. 172 (1923); *Heisler* v. *Thomas Colliery Co.,* 260 U. S. 245 (1922); *Coe* v. *Errol,* 116 U. S. 517 (1886).

[23] See note 11 *supra.*

[24] See *Paul* v. *Virginia,* 8 Wall. 168, 180–81 (1868); *Travis* v. *Yale & Towne Mfg. Co.,* 252 U. S. 60, 78 (1920).

[25] *Travis* v. *Yale & Towne Mfg. Co., supra* note 24, at 82.

"Indeed, without some provision of the kind removing from the citizens of each State the disabilities of alienage in the other States, and giving them equality of privilege with citizens of those States, the Republic would have constituted little more than a league of States; it would not have constituted the Union which now exists." *Paul* v. *Virginia,* 8 Wall. 168, 180 (1868).

In line with this underlying purpose, it was long ago decided that one of the privileges which the clause guarantees to citizens of State A is that of doing business in State B on terms of substantial equality with the citizens of that State.[26]

Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them.[27] The inquiry must also, of course, be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures.

With these factors in mind, we turn to a consideration of the constitutionality of § 3379.

By that statute South Carolina plainly and frankly discriminates against non-residents, and the record leaves little doubt but what the discrimination is so great that its

---

[26] *Ward* v. *Maryland,* 12 Wall. 418 (1870); see also *Chalker* v. *Birmingham & N. W. R. Co.,* 249 U. S. 522 (1919); *Shaffer* v. *Carter,* 252 U. S. 37, 52–53 (1920).

[27] See *Travis* v. *Yale & Towne Mfg. Co.,* 252 U. S. 60, 79 (1920).

practical effect is virtually exclusionary.[28] This the appellees do not seriously dispute. Nor do they argue that since the statute is couched in terms of residence it is outside the scope of the privileges and immunities clause, which speaks of citizens. Such an argument, we agree, would be without force in this case.[29]

As justification for the statute, appellees urge that the State's obvious purpose was to conserve its shrimp supply, and they suggest that it was designed to head off an impending threat of excessive trawling. The record casts some doubt on these statements.[30] But in any event,

---

[28] The parties stipulated that in 1946, the year before non-residents had to pay higher fees than residents, 100 non-resident boats were licensed and that in 1947 only 15 such boats were licensed. Even those 15 were presumably owned by persons who had fished in South Carolina waters the three preceding years and were thus eligible for $150 licenses, since the appellees conceded on oral argument here that no $2,500 licenses had been taken out. See note 11 *supra*.

[29] See *Blake* v. *McClung*, 172 U. S. 239, 247 (1898); *Chalker* v. *Birmingham & N. W. R. Co.*, 249 U. S. 522 (1919); *Travis* v. *Yale & Towne Mfg. Co.*, 252 U. S. 60, 79 (1920).

[30] It is relevant to note that the statute imposes no limitation on the number of resident boats which may be licensed, and it was stipulated that while the number of non-resident boats fell from 100 to 15 between 1946 and 1947, the total number of boats licensed increased during that time from 254 to 271.

The reports of the State Board of Fisheries for several years back, while expressing solicitude as to the need for conservation measures, reveal equal concern with methods for increasing the market for shrimp—by advertising, air shipments, etc.—and contain frequent references to the economic importance of the shrimp industry to the State. The 1945 report, for example, said that "The shrimp business in our State is quite an industry, it employs numbers of men and boat crews spend large sums of money on repairs, gasoline, oil and food besides the money that is spent by the individuals personally." In connection with the possibility of air shipments to large consuming centers such as New York, the same report said that air transportation "should increase the consumption of same [i. e., seafoods] in

appellees' argument assumes that any means adopted to attain valid objectives necessarily squares with the privileges and immunities clause. It overlooks the purpose of that clause, which, as indicated above, is to outlaw classifications based on the fact of non-citizenship unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed.

In this connection appellees mention, without further elucidation, the fishing methods used by non-residents, the size of their boats, and the allegedly greater cost of enforcing the laws against them. One statement in the appellees' brief might also be construed to mean that the State's conservation program for shrimp requires expenditure of funds beyond those collected in license fees—funds to which residents and not non-residents contribute. Nothing in the record indicates that non-residents use larger boats or different fishing methods than residents, that the cost of enforcing the laws against them is appreciably greater, or that any substantial amount of the State's general funds is devoted to shrimp conservation. But assuming such were the facts, they would not necessarily support a remedy so drastic as to be a near equivalent of total exclusion. The State is not without power, for example, to restrict the type of equipment used in its

---

large quantities; it will also create a much greater demand for shrimp and seafoods all over the universe, and it will place them in sections where they are very seldom consumed with the result that many more people will get sold on the idea of eating same." And the 1946 report's section on shrimp concluded with the statement that "To be able to make this report is certainly a pleasure to the State Board of Fisheries as we are able to show that the catch of shrimp this season was nearly twice as large as in the previous year."

fisheries,[31] to graduate license fees according to the size of the boats,[32] or even to charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose or for any conservation expenditures from taxes which only residents pay. We would be closing our eyes to reality, we believe, if we concluded that there was a reasonable relationship between the danger represented by non-citizens, as a class, and the severe discrimination practiced upon them.

Thus, § 3379 must be held unconstitutional unless commercial shrimp fishing in the maritime belt falls within some unexpressed exception to the privileges and immunities clause.

Appellees strenuously urge that there is such an exception. Their argument runs as follows: Ever since Roman times, animals *ferae naturae,* not having been reduced to individual possession and ownership, have been considered as *res nullius* or part of the "negative community of interests" and hence subject to control by the sovereign or other governmental authority. More recently this thought has been expressed by saying that fish and game are the common property of all citizens of the governmental unit and that the government, as a sort of trustee, exercises this "ownership" for the benefit of its citizens. In the case of fish, it has also been considered that each government "owned" both the beds of its lakes, streams, and tidewaters and the waters themselves; hence it must

[31] See Fla. Stat. Ann. § 374.14 (5) (Supp. 1946); 1947 Gen. Laws of Fla., Act 654; Ga. Code Ann. § 45–109 (1937); Johnson and Lindner, *Shrimp Industry of the South Atlantic and Gulf States* (U. S. Dept. of Commerce, Bureau of Fisheries Investigational Rep. No. 21, 1934) 62–63.

[32] South Carolina has itself imposed such a graduated tax in years past. S. C. Code Ann. § 3375 (1942). See also Ga. Code Ann. § 45–210 (1937); N. C. Gen. Stat. Ann. § 113–165 (Supp. 1945).

also "own" the fish within those waters.  Each govern-
ment may, the argument continues, regulate the corpus
of the trust in the way best suited to the interests of
the beneficial owners, its citizens, and may discriminate
as it sees fit against persons lacking any beneficial inter-
est.  Finally, it is said that this special property interest,
which nations and similar governmental bodies have tradi-
tionally had, in this country vested in the colonial gov-
ernments and passed to the individual States.

Language frequently repeated by this Court appears
to lend some support to this analysis.[33]  But in only one
case, *McCready* v. *Virginia,* 94 U. S. 391 (1876), has the
Court actually upheld State action discriminating against
commercial fishing or hunting by citizens of other States
where there were advanced no persuasive independent
reasons justifying the discrimination.[34]  In that case the
Court sanctioned a Virginia statute applied so as to pro-

---

[33] The most extended exposition appears in the majority opinion
in *Geer* v. *Connecticut,* 161 U. S. 519 (1896).

[34] Appellees rely also upon *Patsone* v. *Pennsylvania,* 232 U. S. 138
(1914), and *Haavik* v. *Alaska Packers Assn.,* 263 U. S. 510 (1924).
The *Patsone* case involved a 1909 Pennsylvania statute forbidding
resident aliens to kill game or to possess firearms useful for that pur-
pose.  On the record before it, the Court concluded that it could
not say that the Pennsylvania legislature was not warranted in assum-
ing that resident aliens were at that time "the peculiar source of the
evil that it desired to prevent."  The statute was therefore held not
to violate the Fourteenth Amendment.  But the theory of the case
was that there was a substantial reason for the discrimination beyond
the mere fact of alienage.  The *Haavik* case involved the validity,
under an Act of Congress, of an Alaskan statute imposing on non-
residents, but not residents, a $5 fishing license fee.  In upholding
the statute the Court pointed out that "We are not here concerned
with taxation by a State."  And in considering the power of Congress
to authorize such a tax, it was added that the fee was a reasonable
contribution toward the protection which the local government af-
forded to non-residents.

hibit citizens of other States, but not Virginia citizens, from planting oysters in the tidal waters of the Ware River. The right of Virginians in Virginia waters, the Court said, was "a property right, and not a mere privilege or immunity of citizenship." And an analogy was drawn between planting oysters in a river bed and planting corn in state-owned land.

It will be noted that there are at least two factual distinctions between the present case and the *McCready* case. First, the *McCready* case related to fish which would remain in Virginia until removed by man. The present case, on the other hand, deals with free-swimming fish which migrate through the waters of several States and are off the coast of South Carolina only temporarily. Secondly, the *McCready* case involved regulation of fishing in inland waters, whereas the statute now questioned is directed at regulation of shrimping in the marginal sea.

Thus we have, on the one hand, a single precedent which might be taken as reading an exception into the privileges and immunities clause and, on the other, a case which does not fall directly within that exception. Viewed in this light, the question before us comes down to whether the reasons which evoked the exception call for its extension to a case involving the factual distinctions here presented.

However satisfactorily the ownership theory explains the *McCready* case, the very factors which make the present case distinguishable render that theory but a weak prop for the South Carolina statute. That the shrimp are migratory makes apposite Mr. Justice Holmes' statement in *Missouri* v. *Holland*, 252 U. S. 416, 434 (1920), that "To put the claim of the State upon title is to lean upon a slender reed. Wild birds are not in the possession of anyone; and possession is the beginning of ownership."

Indeed, only fifteen years after the *McCready* decision, a unanimous Court indicated that the rule of that case might not apply to free-swimming fish.[35]  The fact that it is activity in the three-mile belt which the South Carolina statute regulates is of equal relevance in considering the applicability of the ownership doctrine.  While *United States* v. *California*, 332 U. S. 19 (1947), as indicated above, does not preclude all State regulation of activity in the marginal sea, the case does hold that neither the thirteen original colonies nor their successor States separately acquired "ownership" of the three-mile belt.[36]

The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a State have power to preserve and regulate the exploitation of an important resource.[37]  And there is no necessary conflict between that vital policy consideration and the constitutional command that the State exercise that power, like its other powers, so as not to discriminate without reason against citizens of other States.

These considerations lead us to the conclusion that the *McCready* exception to the privileges and immunities clause, if such it be, should not be expanded to cover this case.

---

[35] *Manchester* v. *Massachusetts*, 139 U. S. 240, 265 (1891).  In that case appellant, a citizen of Rhode Island, was convicted of violating a Massachusetts statute which regulated fishing in Buzzards Bay.  The Court upheld Massachusetts' power to enact the regulation, but pointed out that the statute "makes no discrimination in favor of citizens of Massachusetts and against citizens of other States." *Ibid.*

[36] 332 U. S. 19, 31.

[37] See, *e. g.*, Pound, *An Introduction to the Philosophy of Law*, 197–202.  The fiction apparently gained currency partly as a result of confusion between the Roman term *imperium*, or governmental power to regulate, and *dominium*, or ownership.  Power over fish and game was, in origin, *imperium*. *Ibid.*

Thus we hold that commercial shrimping in the marginal sea, like other common callings, is within the purview of the privileges and immunities clause. And since we have previously concluded that the reasons advanced in support of the statute do not bear a reasonable relationship to the high degree of discrimination practiced upon citizens of other States, it follows that § 3379 violates Art. IV, § 2, of the Constitution.

Appellants maintain that by a parity of reasoning the statute also contravenes the equal protection clause of the Fourteenth Amendment. That may well be true, but we do not pass on this argument since it is unnecessary to disposition of the present case.

*Fifth.* Appellants contend that § 3414,[38] which requires that owners of shrimp boats fishing in the maritime belt off South Carolina dock at a South Carolina port and unload, pack, and stamp their catch (with a tax stamp) before "shipping or transporting it to another state," burdens interstate commerce in shrimp in violation of Art. I, § 8, of the Constitution.

The record shows that a high proportion of the shrimp caught in the waters along the South Carolina coast, both by appellants and by others, is shipped in interstate commerce. There was also uncontradicted evidence that appellants' costs would be materially increased by the necessity of having their shrimp unloaded and packed in South Carolina ports rather than at their home bases in Georgia where they maintain their own docking, warehousing, refrigeration and packing facilities. In addition, an inevitable concomitant of a statute requiring that work be done in South Carolina, even though that be economically disadvantageous to the fishermen, is to divert to South Carolina employment and business which might otherwise go to Georgia; the necessary tendency of the statute is to

---

[38] See note 13 *supra.*

impose an artificial rigidity on the economic pattern of the industry.

Appellees do not contest the fact that the statute thereby burdens, to some extent at least, interstate commerce in shrimp caught in waters off the South Carolina coast. Again, however, they rely on the fact that the commerce affected is in fish rather than some other commodity. They urge that South Carolina, because of its ownership of the shrimp, could constitutionally prohibit all shipments to other States. It follows, they imply, that the State could impose lesser restrictions, such as those here at issue, on out-of-state shipments.

There is considerable authority, starting with *Geer* v. *Connecticut,* 161 U. S. 519 (1896), to support the contention that a State may confine the consumption of its fish and game wholly within the State's limits. We need not pause to consider whether this power extends to free-swimming fish in the three-mile belt, for even as applied to fish taken in inland waters it has been held that where a State did not exercise its full power, but on the contrary permitted shipments to other States, it could not at the same time condition such shipments so as to burden interstate commerce. In *Foster Packing Co.* v. *Haydel,* 278 U. S. 1 (1928), the Court held it was an abuse of discretion for a district court not to enter an order temporarily enjoining, as an unconstitutional burden on interstate commerce, enforcement of a Louisiana statute which permitted the shipment of shrimp from Louisiana to other States only if the heads and hulls had previously been removed. In distinguishing the *Geer* case, the following comment was made:

"As the representative of its people, the State might have retained the shrimp for consumption and use therein. . . . But by permitting its shrimp to be

taken and all the products thereof to be shipped and sold in interstate commerce, the State necessarily releases its hold and, as to the shrimp so taken, definitely terminates its control. Clearly such authorization and the taking in pursuance thereof put an end to the trust upon which the State is deemed to own or control the shrimp for the benefit of its people. And those taking the shrimp under the authority of the Act necessarily thereby become entitled to the rights of private ownership and the protection of the commerce clause." [39]

In *Johnson* v. *Haydel*, 278 U. S. 16 (1928), the same conclusion was reached, on the basis of the *Foster Packing Co.* case, as to a similar statute relating to oysters.

Similarly in the present case, South Carolina has not attempted to retain for the use of its own people the shrimp caught in the marginal sea. Indeed, the State has been eager to stimulate interstate shipments and sales as a means of increasing the employment and income of its shrimp industry.[40] Thus even if we assume that South Carolina could retain for local consumption shrimp caught

---

[39] 278 U. S. 1, 13.

[40] See note 30 *supra*. The District Court thought that the *Foster Packing Co.* and *Johnson* cases had been rendered inapplicable to this case by *Bayside Fish Flour Co.* v. *Gentry*, 297 U. S. 422 (1936). The California statute which the Court upheld in that case, however, was of a far different type than the one with which we are now dealing. The statute in effect limited the number of fish which could be reduced to fish flour as apart from those processed or sold in other forms. In rejecting the appellant's argument that the statute unconstitutionally burdened interstate commerce, the Court said that "It in no way limits or regulates . . . the movement of the sardines from outside into the state, or the movement of the manufactured product from the state to the outside. The act regulates only the manufacture within the state. Its direct operation, intended and actual, is wholly local." 297 U. S. 422, 425–26.

in the maritime belt to the same extent as if they were taken in inland waters, the *Geer* case would not support § 3414.

In upholding this statute, the court below adduced a reason not advanced by appellees, that the requirements as to docking, unloading, packing, and affixing a tax stamp were a proper means of insuring collection of the $\frac{1}{8}\cent$ a pound tax.[41]  But the importance of having commerce between the forty-eight States flow unimpeded by local barriers persuades us that State restrictions inimical to the commerce clause should not be approved simply because they facilitate in some measure enforcement of a valid tax.

Thus we hold that § 3414 violates the commerce clause of Art. I, § 8 of the Constitution.

To sum up, we hold that the District Court had jurisdiction to entertain the attacks pressed by the individual appellants, but not the corporate appellant, on all the statutes save the one relating to income taxes; that South Carolina has power, in the absence of a conflicting federal claim, to regulate fishing in the marginal sea; and that in § 3374 of the South Carolina Code, though not in §§ 3379 and 3414, the State has exercised that power in a manner consistent with restraints which the Constitution imposes upon the States.  The District Court's

---

[41] The District Court also said that the requirements of § 3414 were a reasonable means of maintaining the good reputation of products originating in South Carolina.  But the appellees do not pretend that the statute results in better preservation of the shrimp in healthful form.  Moreover, since shrimp caught off the shores of South Carolina are indistinguishable from those taken off the shores of neighboring States, purchasers would have no reason to suppose that shrimp packed in Georgia, if inferior, were products of South Carolina.

judgment refusing equitable relief is affirmed with respect to § 3374 and the income tax statute and reversed with respect to §§ 3379 and 3414.

*Affirmed in part and reversed in part.*

Mr. Justice Black concurs in the judgment of the Court and all of the opinion except part *Fifth*.

Mr. Justice Frankfurter, whom Mr. Justice Jackson joins, concurring.

Barring the portion entitled *Fourth*, I join the Court's opinion. While I agree that South Carolina has exceeded her power to control fisheries within her waters, I rest the invalidity of her attempt to do so on the Commerce Clause. The Court reaches this result by what I deem to be a misapplication of the Privileges-and-Immunities Clause of Art. IV, § 2, of the Constitution.

To regard any limitation upon the Privileges-and-Immunities Clause as "some unexpressed exception" and not give any clue to the basis on which such an "exception" may be implied is to leave the matter too much at large. It deals with the Constitution as though its various clauses were discrete and not a coherent scheme for government. Specifically, the Privileges-and-Immunities Clause, like the Contract Clause, must be put "in its proper perspective in our constitutional framework." *East New York Savings Bank* v. *Hahn,* 326 U. S. 230, 232.

Like other provisions of the Constitution, the Clause whereby "The Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States" must be read in conjunction with the Tenth Amendment to the Constitution. This clause presupposes the continued retention by the States of powers

that historically belonged to the States, and were not explicitly given to the central government or withdrawn from the States. I think it is fair to summarize the decisions which have applied Art. IV, § 2, by saying that they bar a State from penalizing the citizens of other States by subjecting them to heavier taxation merely because they are such citizens or by discriminating against citizens of other States in the pursuit of ordinary livelihoods in competition with local citizens. It is not conceivable that the framers of the Constitution meant to obliterate all special relations between a State and its citizens. This Clause does not touch the right of a State to conserve or utilize its resources on behalf of its own citizens, provided it uses these resources within the State and does not attempt a control of the resources as part of a regulation of commerce between the States. A State may care for its own in utilizing the bounties of nature within her borders because it has technical ownership of such bounties or, when ownership is in no one, because the State may for the common good exercise all the authority that technical ownership ordinarily confers.

When the Constitution was adopted, such, no doubt, was the common understanding regarding the power of States over their fisheries, and it is this common understanding that was reflected in *McCready* v. *Virginia,* 94 U. S. 391. The *McCready* case is not an isolated decision to be looked at askance. It is the symbol of one of the weightiest doctrines in our law. It expressed the momentum of legal history that preceded it, and around it in turn has clustered a voluminous body of rulings. Not only has a host of State cases applied the *McCready* doctrine as to the power of States to control their game and fisheries for the benefit of their own citizens, but in our own day this Court formulated the amplitude of the

*McCready* doctrine by referring to "the regulation or distribution of the public domain, or of the common property or resources of the people of the State, the enjoyment of which may be limited to its citizens as against both aliens and the citizens of other States." *Truax* v. *Raich*, 239 U. S. 33, 39–40.

But a State cannot project its powers over its own resources by seeking to control the channels of commerce among the States. It is one thing to say that a food supply that may be reduced to control by a State for feeding its own people should be only locally consumed. The State has that power and the Privileges-and-Immunities Clause is no restriction upon its exercise. It is a wholly different thing for the State to provide that only its citizens shall be engaged in commerce among the States, even though based on a locally available food supply. That is not the exercise of the basic right of a State to feed and maintain and give enjoyment to its own people. When a State regulates the sending of products across State lines we have commerce among the States as to which State intervention is subordinate to the Commerce Clause. That is the nub of the decision in *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1. South Carolina has attempted such regulation of commerce in shrimp among the States. In doing so she has exceeded the restrictions of the Commerce Clause.

MR. JUSTICE RUTLEDGE, concurring.

I agree with the result and the Court's opinion, subject to one interpretation or qualification of the opinion's Fifth part.

The requirement that owners of boats fishing in the maritime belt dock at a South Carolina port, unload, pack, and stamp their catch (for tax purposes), before "shipping or transporting it to another state," is not merely a regu-

lation of commerce burdening it in the sense of materially increasing the shipper's costs. Many valid regulations of commerce do this. The regulation in question goes farther. It is aimed in terms directly at interstate commerce alone, and thus would seem to be discriminatory in intent and effect upon that commerce. Moreover, in my opinion, it is of such a character that, if applied, for all practical purposes it would block the commerce.

Since it was exactly that sort of state regulation the commerce clause was designed to strike down, I agree that this one cannot stand. The same considerations I also think would be applicable to nullify the license fees levied against nonresidents, since upon the record their transportation of catches would seem to be exclusively in interstate commerce, or practically so.