George W. DOUD, Donald Q. McDonald, and J. Wesley Carlson, doing business as Bondified Systems, and Eugene Derrick, Plaintiffs,

v.

Orville HODGE, Auditor of Public Accounts of the State of Illinois (Lloyd Morey), Latham Castle, Attorney General of the State of Illinois, and John Gutknecht, State's Attorney of Cook County, Illinois, Defendants.

Civ. A. No. 53 C 2322.

United States District Court
N. D. Illinois, E. D.
June 12, 1956.

888

John J. Yowell, Leonard Bosgraf, Harold B. MacKenzie, Chicago, Ill., for plaintiffs.

Latham Castle, Atty. Gen. of Illinois, John Gutknecht, State's Atty. of Cook County, Ill., Chicago, Ill., for defendants. William C. Wines, Raymond S. Sarnow, Asst. Attys. Gen. of Illinois, Clarence W. Beatty, Jr., Asst. State's Atty. of Cook County, Ill., Chicago, Ill., of counsel.

Hirsch E. Soble, Chicago, Ill., amicus curiae.

Before SCHNACKENBERG, Circuit Judge, and LA BUY and HOFFMAN, District Judges.

HOFFMAN, District Judge.

The plaintiffs, George W. Doud, Donald Q. McDonald and J. Wesley Carlson, a partnership doing business as Bondified Systems, and Eugene Derrick, agent of said partnership, seek to enjoin the defendants from enforcing the provisions of the Illinois Community Currency Exchange Act (Ill.Rev.Stat.1955, c. 16½, §§ 30–56.3) against them on the ground that it violates the Fourteenth Amendment to the federal constitution in that it discriminates unlawfully against them and in favor of the American Express Company. The defendants are the Auditor of Public Accounts of the State of Illinois, the Attorney General of the State of Illinois, and the State's Attorney of Cook County, Illinois.

After all of the evidence was heard, this court, pursuant to a memorandum of February 4, 1955, 127 F.Supp. 853, dismissed the complaint for want of jurisdiction. Brief findings of fact and conclusions of law were entered on February 9, 1955. Our order dismissing the complaint was reversed by the Supreme Court, 350 U.S. 485, 76 S.Ct. 491, March 26, 1956, which remanded the case to us. Having considered the evidence and the briefs previously filed by the parties, we are ready to determine whether or not the plaintiffs are entitled to the relief they seek.

The Illinois Community Currency Exchange Act establishes a system of regulation of currency exchanges throughout the state and requires among other things, a license, the payment of fees, bonds, insurance, annual reports, etc. The provisions of the Act apply to all community currency exchanges as that term is defined in § 31 of the Act. It is in the definition of a currency exchange, however, that the alleged discriminatory provision appears. Section 31 provides:

" 'Community currency exchange' means any person, firm, association,

partnership or corporation, * * * engaged at a fixed and permanent place of business, in the business or service of, and providing facilities for, cashing checks, drafts, money orders or any other evidences of money acceptable to such community currency exchange, for a fee or service charge or other consideration, *or engaged in the business of selling or issuing money orders under his or their or its name, or any other money orders (other than* United States Post Office money orders, *American Express Company money orders*, Postal Telegraph Company money orders, or Western Union Telegraph Company money orders), or engaged in both such businesses, or engaged in performing any one or more of the foregoing services." (Emphasis added.)

The plaintiffs, who sell "Bondified" Post Card Checks and Money Orders under a license from Checks, Inc.,[1] a Minnesota corporation which owns the registered trade mark, contend, and the evidence sustains, that they operate their business in substantially the same manner as that of the American Express Company— i. e., they confine their operations to selling and issuing money orders, and this business is conducted through authorized agents,[2] located principally in retail establishments such as drug and grocery stores. Yet the plaintiffs are unable to operate lawfully under the Act since § 38 prohibits a currency exchange from being conducted as a part of another business and even if they could overcome this obstacle, they would be required to obtain a separate license for each agency and to pay the numerous license and inspection fees for each outlet. American Express, on the other hand, is relieved of all these burdens.

The defendants have raised several preliminary matters in addition to the point previously dealt with by this court and the Supreme Court. Defendants claim that the plaintiffs may not invoke the equitable powers of this court because they have not come into equity with clean hands. For this they rely on two matters: (1) On the partnership money order forms the word "Licensed" appears at the bottom of the form in small letters opposite the word "Bonded". This is said to amount to a fraud on the public by implying that plaintiffs are licensed under the Illinois Currency Exchange Act. (2) The operation by the partnership under a license from Checks, Inc., is said itself to constitute a fraud because no license of a trade mark may be made unless accompanied by a transfer of the business.

The defense of unclean hands could be summarily disposed of by reference to a similar charge made in Toomer v. Witsell, 1948, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460. The Supreme Court noted that some of the plaintiffs had previously been convicted of violations of the statutes whose validity they attacked.

"The District Court held that this previous misconduct, not having any relation to the constitutionality of the challenged statutes, did not call for application of the clean hands maxim. We agree." 334 U.S. at page 393, 68 S.Ct. at page 1160; and see opinion of the District Court E.D.S.C.1947, 73 F.Supp. 371, 374.

Since the defendants vigorously urge this point, we will go beyond the short answer. While the use of the word "Licensed" might appear ambiguous to us, no evidence was introduced to show that the public is enticed into purchasing Bondified Money Orders by reason of their be-

---

1. The license agreement with Checks, Inc., was entered into by the corporation organized by the three plaintiffs, Bondified Systems, Inc. In accordance with its terms, however, the license was assigned to the partnership formed by the same three persons.

2. Plaintiffs, in recognition of the fact that they cannot operate legally under the Illinois Act, have established to date only one agency in this state although they have 120 in operation in Northern Indiana.

lief that the plaintiffs hold a license under the Currency Exchange Act. Moreover, we were persuaded by the plaintiffs' sincerity in explaining that they intended the expression to refer to a license from Checks, Inc., to handle Bondified Money Orders. This conduct is clearly not of such a nature as to bar the plaintiffs from relief.

■ With respect to the license of the trade mark "Bondified" from Checks, Inc., defendants contend that the attempt to license the use of a trade mark without a concurrent transfer of the business itself was ineffective and a fraud. Even if it is assumed that the same principles apply to service marks as to ordinary trade marks, a license may be made of a mark other than as an incident of a transfer of business so long as the agreement is not merely a "naked" license agreement. E. I. du Pont de Nemours & Co. v. Celanese Corp. of America, 1948, 167 F. 2d 484, 35 C.C.P.A., Patents, 1061, 3 A.L.R.2d 1213 (decided without benefit of the liberalizing provisions of the Lanham Act). In that case the court approved an agreement under which the licensor established certain standards for the licensee to follow in making the product under the assigned trade mark. A trade mark license is valid if it provides for "supervisory control of the product or services". Arthur Murray, Inc., v. Horst, D.C.D. Mass.1953, 110 F.Supp. 678, 679. The "Operator Contract" (Pl. Ex. 5) between Checks, Inc., and Bondified Systems, Inc., through which the plaintiffs are authorized to deal in Bondified checks and money orders, contains numerous controls and standards which Bondified Systems and its agencies must meet and is much more than a "naked" license agreement.

■ The plaintiffs have, we believe, sufficiently demonstrated the imminence of irreparable injury, entitling them to injunctive relief. See Toomer v. Witsell, 1948, 334 U.S. 385, 391–392, 68 S.Ct. 1156, 92 L.Ed. 1460. While the defendants allege that their threats to enforce the Act were general and call attention to the fact that they have taken no legal action against the plaintiffs,[3] they concede that plaintiffs will be required to qualify under the Act and that they will enforce it against plaintiffs when the latter violate it, which admittedly they are doing now. The defendant officials were not apprised of a violation until shortly before plaintiffs filed their complaint. To operate as a currency exchange without first securing a license subjects the plaintiffs to a criminal prosecution and the penalty of a heavy fine, or imprisonment, or both. In the meantime the plaintiffs, presumably to avoid further possible penalties, are withholding establishment of additional agencies and losing the opportunity to conduct and expand their business.

■ We turn now to the constitutional validity of the Currency Exchange Act as applied to these plaintiffs. In Currency Services, Inc., v. Matthews, D.C.W.D. Wis.1950, 90 F.Supp. 40, a federal three judge court enjoined enforcement of the Wisconsin currency exchange statute, which was virtually identical to the Illinois statute, on the ground that it violated the equal protection clause of the Fourteenth Amendment. The plaintiff in the Matthews case, like these plaintiffs, engaged only in the business of issuing money orders. The Wisconsin court held:

"It is the inclusion, in the definition of the term 'community currency exchange', of one who, though not engaged in the check-cashing business ordinarily designated by that term is 'engaged in the business of selling or issuing money orders',

3. The State's Attorney of Cook County contends that he should not be made a party to this proceeding because the plaintiffs' only agency operating at the moment is not located in Cook County, the territorial limit of his authority. The injunctive relief requested, however, is intended to prevent interference with operation of plaintiffs' business in the future. Moreover, the plaintiffs themselves are located in Cook County, and any attempts to enforce the Act would have to be directed primarily against them in that jurisdiction.

coupled with the exemption of a company engaged in that very business, which, it seems to us, renders the statute discriminatory and unconstitutional as applied to the plaintiff corporation or to any other person or firm engaged in the business of selling or issuing money orders but not in the ordinary business of a currency exchange." 90 F.Supp. at page 45.

We approve the reasoning and conclusions of the Wisconsin court and see no reason to depart from them in this case.

The fact that the constitutionality of the Illinois Act was previously sustained by the Illinois Supreme Court in McDougall v. Lueder, 1945, 389 Ill. 141, 58 N.E.2d 899, 156 A.L.R. 1059, is not conclusive. A close examination of the McDougall opinion discloses that the court based its conclusion that the classification was reasonable on the ground that the legislature was concerned only with regulating local community exchanges, as opposed to world-wide operations. This point was answered in the Matthews case:

"While it is true that American Express operates on a world-wide scale, this does not alter the fact that its Wisconsin operations are not at all different from those contemplated by plaintiff corporation and would be subject to the provisions of the statute if carried on by any one other than American Express or its agents." 90 F.Supp. at page 44.

While we accord great respect to the views of the Illinois Supreme Court, it does not appear that that court had occasion to consider the full extent of the Act's discriminatory effect. Moreover, it is difficult to accept the attempt to explain the exemption of American Express on the basis that regulation of that company is not required in order to protect local interests. The evidence here, while not entirely clear, tends to show that American Express has no license to trans-

act business in this state, is not subject to any form of state regulation, does not always require bonds of its agents, as plaintiffs do, and may even be able successfully to avoid service of process by the courts of this state.

It is further suggested that the real purpose of the Act was to eliminate irresponsible fly-by-night companies, and the exemption merely reflected the high integrity and financial responsibility of American Express which is unique in its field. No one denies these facts. Nor do we suggest that the legislature could not establish reasonable standards of financial responsibility which all would be required to meet to qualify for an exemption. But the difficulty with this Act is that it denies everyone but American Express the opportunity to demonstrate financial responsibility or the adoption of adequate safeguards to protect the public. The plaintiffs, who have adopted a number of precautionary measures to insure protection of their customers, have no opportunity to prove their trustworthiness. Moreover, at least one of the provisions of the Act cannot be reconciled with standards of financial responsibility. Under § 38 the plaintiff Derrick, who has an established Bondified agency, is prohibited from selling Bondified money orders in connection with his drug store business, but he was permitted to sell American Express money orders at the same store in 1948 and 1949. This restriction exists quite apart from the requirements of licensing and fees. While the plaintiffs have only begun their business,[4] other Bondified licensees have operated for ten years or more and have conducted a substantial and, so far as this record shows, a responsible business. We are unable to find a reasonable basis on which to sustain the classification expressed in the Illinois Currency Exchange Act.

In view of the Illinois Supreme Court's statement in the McDougall case that "The General Assembly would surely nev-

---

4. Nevertheless, in their first year of operation the plaintiffs sold over $1,400,000 of money orders in Northern Indiana alone.

er have passed the act if they had thought the said companies [i. e., American Express, Postal Telegraph and Western Union] would be made subject to its rules and regulations," 389 Ill. at page 151, 58 N.E.2d at page 904, an injunction will issue restraining the defendants from enforcing the provisions of the Community Currency Exchange Act against the plaintiffs, so long as they engage only in the business of issuing and selling money orders.

Counsel for the plaintiffs will prepare and submit to the court on or before June 15, 1956, findings of fact, conclusions of law and a judgment order in keeping with the views herein expressed.