[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT (## 110 and 111)
This litigation concerns the constitutionality and legality of Public Acts 1999, No. 99-173 (P.A. 99-173 or "rebate act").
The plaintiffs include the Attorney Genera and Chief Legal Officer of the State of New York, Eliot Spitzer (Spitzer), who brings this action as parens patriae on behalf of New York's sovereign interest and for the benefit of the people of the State of New York. The other plaintiffs are our individual residents of the State of New York, three of horn commute to work in the State of Connecticut and file non-resident income tax returns with the State of Connecticut. The fourth individual plaintiff is a New York resident who rents real property within the State of Connecticut and who purchased consumer goods and paid sales tax in the State of Connecticut during the relevant calendar year of 1998.
The defendants are Gene Gavin (Gavin), sued in his official capacity as Commissioner of Revenue Services for the State of Connecticut, and Nancy S. Wyman (Wyman), sued in her official capacity as Comptroller of the State of Connecticut. Gavin is designated by the rebate act to participate in the implementation of the sales tax rebate, while Wyman is designated to draw the order on the state treasury to pay the rebate.
The plaintiffs seek declaratory and injunctive relief against the defendants on the basis that the rebate act violates the constitution of the United States, article fourth, § 2 (privileges and immunities clause), as well as the equal protection clauses of the federal and state constitutions. They contend that the act excludes from its coverage tens of thousands of New York residents who are employed n Connecticut, file Connecticut nonresident income tax returns, and individually contribute well over $50 annually to Connecticut sales tax revenues. The parties have agreed to submit these issues to the court by way of a joint stipulation of facts and cross motions for summary judgment.
The facts presented to the court as set forth in the joint stipulation CT Page 12239 of facts are as follows:
1. In P.A. 99-173, §§ 3 and 4, the Connecticut General Assembly authorized a program "to refund the existing state budget surplus in the form of a rebate of nonbusiness consumer sales and use taxes paid by residents of the state in calendar year 1998. . . ."
2. The 1998 Connecticut budget surplus was derived from a variety of taxes, fees and other sources, including the sales tax. The 1998 budget surplus was the result of a decision to not spend the surplus on new or existing state programs.
3. Only Connecticut residents were eligible to receive the payment authorized by the Connecticut General in P.A. 99-173, §§ 3 and 4.
4. New York residents and other nonresidents of the State of Connecticut pay approximately 6.1% of the nonbusiness consumer sales and use taxes in the State of Connecticut.
5. New York residents and other nonresidents of the State of Connecticut were not eligible to receive the payment authorized inP.A. 99-173, §§ 3 and 4.
6. The payment authorized by P.A. 99-173, §§ 3 and 4, was not an ongoing provision of the tax code of the State of Connecticut. By the terms of the rebate act, the payment was limited to a single year, being 1998.
7. The General Assembly appropriated an original total of $109,500,000 to make the payments authorized by P.A. 99-173, §§ 3 and 4. These funds were expended.
8. In Special Acts 2000, No. 00-1, the Connecticut General Assembly authorized the transfer of additional funds from unexpended appropriations for the Department of Higher Education, the Office of Health Care Access and t e Department of Information Technology to the Department of Revenue Services, to make the payments authorized byP.A. 99-173, § 3 and 4.
9. As of June 1, 2000, approximately 2.3 million residents of the State of Connecticut had been mailed the payments authorized by P.A. 99-173, §§ 3 and 4.
10. As of June 1, 2000, approximately $431,300.00 remained available to make the payments authorized by P.A. 99-173, §§ 3 and 4.
CT Page 12240 11. As of June 1, 2000, payments had been, mailed to all known "eligible individuals" listed in P.A. 99-173, § 4(a)(1).
12. Plaintiff Marguerite Bain is a resident of the State of New York and regularly commutes to work in the State of Connecticut. Ms. Bain filed a non-resident income tax return with the State of Connecticut in 1998.
13. Plaintiff Beryl Funderburk is a resident of the State of New York, and regularly commutes to work in the State of Connecticut. Ms. Funderburk filed a non-resident Connecticut income tax return with the State of Connecticut in 1998.
14. Plaintiff Donna Krueper is a resident of the State of New York, and works regularly in Connecticut. Mrs. Krueper filed a non-resident income tax return with the State of Connecticut in 1998.
15. Plaintiff Doris Weil filed a 1998 resident Connecticut income tax return and received a $50.00 rebate check.
16. Plaintiff Eliot Spitzer is the Attorney General of the State of New York.
17. Defendant Gene Gavin is the Commissioner of Revenue Services of the State of Connecticut.
In support of their motion for summary judgment, the defendants filed two affidavits. Gavin attests by affidavit dated July 7, 2000, thatP.A. 99-173, § 4(g), authorizes him in his, official capacity to determine in his sole discretion whether an individual qualifies for the rebate provided by the rebate act, and as of the date of his affidavit, he had not had cause to exercise such discretion. The Secretary of the Office of Policy and Management of the State of Connecticut, Mark S. Ryan, attested by affidavit that the unexpended balance of funds appropriated by the Connecticut General Assembly to make the payments authorized byP.A. 99-173 lapsed on July 31, 2000, in accordance with General Statutes § 4-89(a).
Summary judgment is specifically authorized by Practice Book §17-44. "Practice Book § [17-49] provides that rendition of a summary judgment is appropriate if the pleadings, affidavits and any other proof submitted show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." (Internal quotation marks omitted.) Miller v. United Technologies Corp. 732, 751,660 A.2d 810 (1995). "The test to be applied is whether a party would be entitled to a directed verdict on the same facts." Gabrielle v. HospitalCT Page 12241of St. Raphael, 33 Conn. App. 378, 383, 635 A.2d 1232, cert. denied,228 Conn. 928, 640 A.2d 115 (1994). Where, as in the instant case, there is no genuine issue of material fact to be tried, and the parties agree to the method, it is appropriate to decide the case on summary judgment, which is certainly a more efficient and practical manner for all concerned. See Mac's Car City, Inc. v. American National Bank,205 Conn. 255, 261, 532 A.2d 1302 (1987).
The court will consider first the plaintiffs' argument that the rebate act violates the privileges and immunities clause of the federal constitution. The constitution of the United States, article fourth, § 2, provides that: "The citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." When evaluating a tax under the privileges and immunities clause, the court is compelled to apply a standard of substantial equality of treatment for resident and nonresident taxpayers. Lunding v. New York Tax AppealsTribunal, 522 U.S. 287, 118 S.Ct. 766, 1773, 139 L.Ed.2d 717 (1998);Austin v. New Hampshire, 420 U.S. 656, 665, 95 S.Ct. 1191, 43 L.Ed.2d 530
(1975). The United States Supreme Court has declared that the privileges and immunities clause prohibits
 discrimination against citizens of other states where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other states. But it does not preclude disparity of treatment in many situations where there are perfectly valid and independent reasons for it. Thus, the issue in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relationship to them.
Toomer v. Witsell, 334 U.S. 385, 396, 68 S.Ct. 1156, 92 L.Ed. 1460
(1948), also relied upon by the Supreme Court in Lunding v. New York TaxAppeals Tribunals supra, 522 U.S. 296.
In Supreme Court of New Ham shire v. Piper, 470 U.S. 274,105 S.Ct. 1272,84 L.Ed.2d 205 (1985), the court held that "the privileges and immunities clause is not an absolute. . . . The clause does not preclude discrimination against nonresidents where "(i) there is a substantial reason for the difference in treatment; and (ii) the discrimination practiced against nonresidents bears a substantial relationship to the State's objective. . . ." (Citations omitted.) Piper, supra, 470 U.S. 285. Thus, the court must engage in statutory construction in order to determine the objective of the rebate act.
"In seeking to discern [legislative] intent, [the court should] look to CT Page 12242 the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation. . . ." (Citations omitted; internal quotation marks omitted.) Velez v.Commissioner, 250 Conn. 536, 540, 738 A.2d 604 (1999). The "fundamental objective is to ascertain and give effect to the apparent intent of the legislature." Id.
The purpose of the rebate act is set forth in P.A 99-173, § 3, providing in pertinent part that: "[I]t is found and declared that the State of Connecticut derives revenue from a variety of taxes, fees and other sources, including the State sales tax; it is fair and reasonable to refund the existing State budget surplus in the form of a rebate of nonbusiness consumer sales and use taxes paid by residents of the state in calendar year 1998." That language of the rebate act identifies the sales tax as only one of a number of revenue sources creating the state budget surplus. P.A. 99-173, § 3 then includes the following legislative intent: "It is fair and reasonable to refund the existing State budget surplus in the form of a rebate of non-business consumer sales and use taxes paid by residents of this state in calendar year 1998."
At oral argument, both sides conceded that the legislature was seeking a way to refund a portion of a budget surplus in a manner that would not subject the recipients to federal income taxation, as had been the result with an earlier tax rebate. The refund from the general budget surplus in the form of a sales tax rebate was apparently not subject to federal income taxation for the resident recipients.
The rebate act provided that all eligible residents would receive a $50 refund. The refund amount and eligibility for it were not determined on the basis of any requirement that the recipient actually had paid $50 or more of state sales and use tax, or had paid any taxes of any kind to the state. The only requirement related to residency.
Of course, substantial reasons for limiting the rebate to Connecticut residents include the intent to confer a benefit on the state's citizenry, and effectively deal with a portion of the 1998 budget surplus. The legislature considered at least three alternative ways to deal with the surplus:
 There are three ways we could deal with surplus. Three ways. We could imbed a portion of the surplus into a permanent tax cut. We could alternatively spend it on ongoing programs. Or we could return it to the taxpayers. We fortunately have rejected the CT Page 12243 first [two] courses. We have not imbedded a portion of the surplus in ongoing tax cuts. . . . Similarly we could have, and wisely didn't, imbed the surplus in ongoing spending programs, which could be even more difficult politically and financially to re-tool, and remeasure, and recalibrate against a changed Connecticut economy. Rather, we chose the third and wiser course. To return a portion, not an insignificant portion, namely 109.5 million of the surplus to the taxpayers in checks.
42 Sen. Proc., Pt. 9, 1999 Sess., p. 2966-67, remarks of Senator William H. Nickerson. Moreover, it was a substantial requirement that the rebate be made exclusively to residents, so as to limit the amount of rebate money to only a portion of the budget surplus. Payment of $50 to nonresidents would, have required a greater expenditure of the surplus than desired. The court finds that the discrimination practiced against nonresidents bore a necessary and substantial relationship to the legislative objective of using a portion of the budget surplus in the form of a cash return to its residents.
The defendants further argue that the distribution scheme not only passes muster under the two-part test of Lunding and Austin, it also comports with the right of a state to reserve to its residents certain benefits not shared with nonresidents. In Baldwin v. Fish Game Comm'n,436 U.S. 371, 98 S.Ct. 1852, 56 L.Ed.2d 354, (1978), for example, the Supreme Court had to decide whether a state may charge a nonresident more than it charges a resident for the same elk-hunting license. Such arrangement withstood a privileges and immunities challenge, on the basis of the following reasoning:
 It has not been suggested . . . that state citizenship or residency may never be used by a State to distinguish among persons. Suffrage, for example, always has been understood to be tied to an individual's identification with a particular State. . . . No one would suggest that the Privileges and Immunities Clause requires a State to open its polls to a person who declines to assert that the State is he only one where he claims a right to vote. The same is true as to qualification for elective office of he State. . . . Nor must a State always apply its law or all its services equally to anyone, resident or nonresident, who may request it to do so. . . . Some distinctions between residents and nonresidents merely reflect the fact that this is a Nation composed of CT Page 12244 individual States, and are permitted; other distinctions are prohibited because they hinder the formation, the purpose, or the development of a single Union of those States.
(Citations omitted.) Id., 383. The Supreme Court recognized that elk hunting for recreational purposes was not "fundamental" to the promotion of interstate harmony. Id., 388. "Only with respect to those privileges and immunities blaring upon the vitality of the Nation as a single entity must the State treat all citizens, resident and nonresident, equally." Id., 383. "[Montana's] interest in sharing this limited resource on more equal terms with Montana residents simply does riot fall within the privileges and immunities clause." Id., 388.
The defendants also rely on the analysis of L. Tribe, American Constitutional Law, § 6-35, pp. 532-45 (2d Ed. 1988):
 The [Baldwin] Court appears to have been groping for a principle that would immunize from privileges and immunities review a sphere of rights and opportunities that a people may reserve for themselves. The intuitive notion lurking beneath Baldwin's surface is a strong one. No one would deny that "[s]ome distinctions between residents and non-residents merely reflect the fact that this is a nation composed of individual states. . . ." Indeed, "without certain residency requirements the state would cease to be the separate political communit[y] that history and the constitutional text make plain w[as] contemplated. . . ." So it is that a polity is entitled to reserve to its citizens the right to vote and to hold elective office.
 There also appear to be some goods and services that a state's citizens, having created a reserve for themselves, are entitled to keep for themselves. Thus Montana's carefully-tended elk herds are akin to public libraries, public schools, state universities, state-supported hospitals, and public welfare programs — things that the Court has suggested a state may reserve for the use or enjoyment of its citizens. The Court implied in Baldwin that it would approve even a total exclusion of non-resident hunters upon a showing by the state that any additional hunting opportunities beyond those Montana chose to reserve to its citizens would endanger the elk population to the CT Page 12245 point of extinction. 436 U.S. at 337, citing State v. Kemp, 44 N.W.2d 214 (1950) (upholding total exclusion of nonresident recreational waterfowl hunters) dismissed for want of substantial federal question, 340 U.S. 923 (1951). If a state like Montana were forced to act evenhandedly in distributing its state-created "goodies," perhaps it would simply give up he effort to conserve or create them.
(Citations omitted; internal quotation man omitted.) Id., 539-40.
The court finds on the basis of the above authority that the rebate act was a vehicle by which the legislature dealt with a portion of a budget surplus by refunding to its residents $50 in the form of a sales tax rebate. The rebate amount was not dependent in any way upon the amount of sales tax actually paid by any resident, and the sales and use taxes were not affected. Use of a budget surplus, created by the decisions of elected officials to avoid adjusting the tax level or increasing expenditures, appears to be one of those exceptions contemplated by theBaldwin court, in the form of a "reserve" that the state's residents are entitled to keep for the selves.
The court must next address the plaintiffs' equal protection claim. At issue is whether the rebate act violates the equal protection clause of the fourteenth amendment to the, United States constitution, as well as the constitution of Connecticut, article first, § 20, on the basis that it created a classification based on residence, without any rational basis that does not offend the rights conferred by these documents.[1]
The court's analysis is subject to the rational basis test, inasmuch as no inherently suspect class is at issue.
The rational basis test is satisfied if the legislation's classification is based on a plausible policy reason. See United StatesRailroad Retirement Board v. Fritz, 449 U.S. 166, 174, 179,101 S.Ct. 453,66 L.Ed.2d 368 (1980), reh. denied, 450 U.S. 960, 101 S.Ct. 1421,67 L.Ed.2d 385 (1981); Johnson v. Mehan, 225 Conn. 528, 536, 626 A.2d 24
(1993). The plaintiffs certainly must concede that the legislature acted rationally when it restricted distribution of budget surplus exclusively to its own constituency, so as to limit the fiscal impact of the act and to benefit those who a ready may have experienced the burden of fiscal restraints and the overall tax structure that created the surplus in the first place.
 CONCLUSION
For the above reasons, the court concludes that the legislative CT Page 12246 decision to restrict to state residents a one-time refund of a budget surplus does not violate the privileges and immunities clause or the equal protection clauses of the state and federal constitutions. Judgment is hereby entered for the defendants.
ROBERT F. McWEENY, J.