GILBERT J. POSTLEY, Plaintiff and Appellant, *v.* SECRETARY OF THE TREASURY, Defendant and Appellee.

No. 10798. Argued March 6, 1953.—Decided February 2, 1954.

*Fiddler, González & Nido* and *Andrés Guillemard* for appellant.
*José Trías Monge, Attorney General,* and *Manuel J. Medina
Aymat, Assistant Attorney General,* for appellee. *Charles
R. Hartzell* and *Rafael O. Fernández* as *amici curiae.*

MR. CHIEF JUSTICE SNYDER delivered the opinion of the Court.

Section 12 of the Income Tax Act, as amended by Act
No. 88, Laws of Puerto Rico, 1945, provides for a normal
tax of 7% on the net income of every individual, except that
a nonresident who is not a citizen of Puerto Rico is required
to pay a normal tax of 29% on his net income. Section 13,
as amended by Act No. 433, Laws of Puerto Rico, 1947,
provides for a progressive surtax on residents, which does
not apply to nonresidents who are not citizens of Puerto Rico
"in consideration of the fact that they pay a normal tax of

twenty-nine (29) per cent." Section 18, as amended by Act No. 433, grants a personal exemption of $800 to an unmarried person and $2,000 to the head of a family or a married person living with his husband or wife; it also allows a credit of $400 for each dependent. No such deductions are allowed to nonresidents. Section 19(f), as amended by Act No. 433, provides that nonresidents who are not citizens of Puerto Rico shall not be entitled to the foregoing personal exemptions or credits but are required to pay a flat 29% tax.

In *Buscaglia, Treasurer v. Tax Court, Isabel Pérez Vahamonde, Intervener,* 68 P.R.R. 322, we sustained the foregoing provisions of the Income Tax Act as applied to income for the taxable year ending December 31, 1943. [1] We held that these Sections did not violate the uniformity of taxation, equal protection, and due process clauses of the Organic Act despite the fact that they (1) imposed a higher rate of normal tax upon nonresidents who were not citizens of Puerto Rico than was imposed on residents and (2) denied such nonresidents the personal exemption and credits for dependents to which residents were entitled. We also held in the *Pérez* case that the said Sections of our Income Tax Act did not violate the privileges and immunities clauses of the United States Constitution—Section 1 of the Fourteenth Amendment and Art. IV, § 2, par. 1—as those clauses do not apply to Puerto Rico. [2]

---

[1] In 1943 the rates of taxation were sligthly lower than those involved here, but the difference is not sufficient to affect the issue tendered in the present case.

[2] In the *Pérez* case we expressly overruled *Fiddler v. Tax Court,* 65 P.R.R. 189, and *Buscaglia, Treas. v. Tax Court, Antonio Ahumada Valdés, Intervener,* 65 P.R.R. 921, insofar as those cases held that a nonresident who is not a citizen of Puerto Rico was entitled to invoke the privileges and immunities clauses of the Federal Constitution and the uniformity and equal protection clauses of the Organic Act.

The Court of Appeals for the First Circuit has indicated, in reversing the *Ahumada* case, that the *Pérez* case was correctly decided by us. *Buscaglia v. Ahumada,* 171 F.2d 775 (C.A. 1, 1949). The *Fiddler* case was overruled by the Court of Appeals on procedural grounds and remanded for further proceedings. *Buscaglia v. Fiddler,* 157 F. 2d 579 (C.A. 1,

The *Pérez* case was argued in this Court on July 1, 1947. While it was pending decision, Congress on August 5, 1947 added a privileges and immunities clause to § 2 of the Organic Act. 61 Stat. 772; 48 U.S.C. 737. [3] We pointed out in the *Pérez* case at p. 333 that this new clause applied prospectively and therefore could not affect the result in the *Pérez* case, which involved 1943 income. Accordingly, we left open the question of its effect on the Income Tax Act as applied to income which was received or accrued subsequent to August 5, 1947. The instant case, involving income for the fiscal year ending June 30, 1948, presents the question we left open in the *Pérez* case.

 From August 5, 1947 to date, Gilbert J. Postley has been a citizen of the United States and of the State of New York, and a nonresident of Puerto Rico. [4] As the owner of 450 preferred shares of Eastern Sugar Associates, he was entitled to receive dividends on these shares in the amount of $2,250 for the period from August 20, 1947 to May 20, 1948. Pursuant to § 22 of the Income Tax Act, the sum of $652.51 was withheld by the National City Bank of New York, San Juan Branch, the withholding agent, from the dividends of $2,250. The said $652.51 represented the 29% tax imposed by § 12 of the Act on Postley as a nonresident who is not a

---

1946). We directed the former Tax Court to conduct such further proceedings in *Fiddler* v. *Tax Court*, 68 P.R.R. 784, and the case never reached us again.

[3] For the text of this clause, see footnote 6, *infra*.

For the sake of clarity, unless otherwise indicated, wherever we use the phrase "the privileges and immunities clause" of the Organic Act, it should be understood as meaning only that portion thereof which makes par. 1 of § 2 of Art. IV of the Federal Constitution applicable to Puerto Rico. We do not discuss in detail in this opinion the problem of the applicability to Puerto Rico, by virtue of the Act of Congress of August 5, 1947, of the privileges and immunities clause found in § 1 of the Fourteenth Amendment. We leave that question open in this case. See footnote 15.

[4] Again for the sake of clarity we note that, unless otherwise indicated, throughout this opinion the word "nonresident" means a citizen of the United States and of one of the States of the Union who is not a resident of Puerto Rico within the meaning of our Income Tax Act.

citizen of Puerto Rico for the fiscal year ending June 30, 1948. Postley sued for a refund of the sum of $652.51 on the ground that collection thereof violated the new privileges and immunities clause of § 2 of the Organic Act. The Superior Court heard the case on a stipulation of facts and entered a judgment dismissing the complaint. The case is here on appeal by Postley from that judgment.

As early as 1823 the Supreme Court interpreted the privileges and immunities clause found in Article IV, § 2 of the Federal Constitution as barring a State from taxing the citizens of another State at a higher rate than it taxed its own citizens. *Corfield* v. *Coryell*, 4 Wash. 371 (C.C.Pa., 1823). In *Travis* v. *Yale & Towne Mfg. Co.*, 252 U.S. 60, it was held that a tax by a state on the incomes of residents and nonresidents, which allows exemptions to residents, with increases for married persons and for dependents, but allows no equivalent exemptions to nonresidents, abridges the privileges and immunities of citizens of other states, in violation of § 2 of Article IV of the Federal Constitution. In the *Travis* case the Court said at p. 78:

"The purpose of the provision [Art. IV, § 2 of the Federal Constitution] came under consideration in *Paul* v. *Virginia*, 8 Wall. 168, 180, where the court, speaking by Mr. Justice Field, said: 'It was undoubtedly the object of the clause in question to place the citizens of each State upon the same footing with citizens of other States, so far as the advantages resulting from citizenship in those States are concerned. It relieves them from the disabilities of alienage in other States; it inhibits discriminating legislation against them by other States; it gives them the right of free ingress into other States; and egress from them; it insures to them in other States the same freedom possessed by the citizens of those States in the acquisition and enjoyment of property and in the pursuit of happiness; and it secures to them in other States the equal protection of their laws. It has been justly said that no provision in the Constitution has tended so strongly to constitute the citizens of the United States one people as this.' And in *Ward* v. *Maryland*, 12 Wall. 418, holding a discriminatory state tax upon non-resident traders to

be void, the court, by Mr. Justice Clifford, said (p. 430):
'Beyond doubt those words [privileges and immunities] are
words of very comprehensive meaning, but it will be sufficient
to say that the clause plainly and unmistakably secures and
protects the right of a citizen of one State to pass into any
other State of the Union for the purpose of engaging in lawful
commerce, trade, or business without molestation; to acquire
personal property; to take and hold real estate; to maintain
actions in the courts of the State; *and to be exempt from any
higher taxes or excises than are imposed by the State upon its
own citizens.*'" (First brackets and italics ours.)

In the *Fiddler* and *Ahumada* cases this Court came to the
same conclusion. See footnote 2. We were mistaken in
stating in those cases that Article IV, § 2 applied to Puerto
Rico. But when Congress added a privileges and immunities
clause to § 2 of the Organic Act, the reasoning in the *Fiddler*
and *Ahumada* cases with reference to the privileges and
immunities clause regained its validity as applied to income
received or accrued subsequent to August 5, 1947. *Smith*
v. *Loughman*, 157 N.E. 753 (N.Y., 1927), involving an
inheritance tax, is to the same effect. And *State* v. *Berntsen*, 200 P. 2d 1007 (Idaho, 1948), holds that a state income
tax statute giving Idaho residents a credit against net income
of $1,500 in the case of a husband and wife and $200 for
each dependent and giving nonresidents in the same circumstances a credit of only $700 is void because it infringes the
privileges and immunities clause of the Federal Constitution. See *Recent Statutes*, 53 Harv.L.Rev. 1214; *Notes*, 20
Col.L.Rev. 457, by T.R.P. (apparently Thomas Reed Powell).

Two recent Supreme Court cases have shed considerable
light on this problem. In *Toomer* v. *Witsell*, 334 U. S. 385,
it was held that a South Carolina statute requiring nonresidents to pay a license fee of $2,500 for each shrimp boat
and residents to pay a license fee of only $25 violated the
privileges and immunities clause of Article IV, § 2 of the
Federal Constitution. The Court said at pp. 395–6:

"The primary purpose of this clause, like the clauses between which it is located—those relating to full faith and credit and to interstate extradition of fugitives from justice—was to help fuse into one Nation a collection of independent, sovereign States. It was designed to insure to a citizen of State A who ventures into State B, the same privileges which the citizens of State B enjoy. For protection of such equality the citizen of State A was not to be restricted to the uncertain remedies afforded by diplomatic processes and official retaliation.

"Like many other constitutional provisions, the privileges and immunities clause is not an absolute. It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States. But it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it. Thus the inquiry in each case must be concerned with whether such reasons do exist and whether the degree of discrimination bears a close relation to them. The inquiry must also, of course, be conducted with due regard for the principle that the States should have considerable leeway in analyzing local evils and in prescribing appropriate cures."

The Court adds at p. 398 that the purpose of the privileges and immunities clause "is to outlaw classifications based on the fact of non-citizenship unless there is something to indicate that non-citizens constitute a peculiar source of the evil at which the statute is aimed." It then goes on to point out at pp. 398–9 that *the State may* "restrict the type of equipment used in its fisheries, to graduate license fees according to the size of the boats, or even to *charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose* or for any conservation expenditures from taxes which only residents pay. ..." (Italics ours.) [5]

___

[5] It is important to note that in the *Toomer* case decided in 1948, the Supreme Court at three places cites with approval *Travis v. Yale & Towne Mfg. Co., supra,* a case which is very similar to the present case. The Secretary of the Treasury argues that the *Travis* case should be confined to its facts involving citizens of *neighboring* states. Its language and subsequent Supreme Court decisions leave no basis for such a narrow construction of the *Travis* case.

Mr. Justice Frankfurter, whom Mr. Justice Jackson, joined, concurred as to the other phases of the opinion of the court in the *Toomer* case, but disagreed with the majority opinion as to the privileges and immunities clause. Yet even he states in his concurring opinion at p. 408 that. "I think it is fair to summarize the decisions which have applied Art. IV, § 2, by saying that they bar a State from penalizing the citizens of other States by subjecting them to heavier taxation merely because they are such citizens or by discriminating against citizens of other States in the pursuit of ordinary livelihoods in competition with local citizens."

In *Mullaney* v. *Anderson*, 342 U.S. 415, the Court held that an Alaska statute, providing for licensing of commercial fishermen in territorial waters, and imposing a $5 license fee on residents and a $50 fee on nonresidents, abridged the privileges and immunities clause of Art. IV, § 2 of the Federal Constitution. Here the opinion was written by Mr. Justice Frankfurter, who said at pp. 417-9:

"In *Toomer* v. *Witsell*, 334 U.S. 385, the Court held that Art. IV, § 2 of the Constitution would bar any State from imposing the license fee here attacked. In that case it was said: *'The State is not without power,* for example, to restrict the type of equipment used in its fisheries, to graduate license fees according to the size of the boats, or even *to charge non-residents a differential which would merely compensate the State for any added enforcement burden they may impose* or for any conservation expenditures from taxes which only residents pay.' *Id.,* at 398-399. The challenged discrimination does not come within any of these exceptions. The Tax Commissioner relied on the higher cost of enforcing the license law against non-resident fishermen to justify the difference in fees, and the District Court found that 90 per cent of the cost of enforcement was incurred in collecting the fees from nonresidents. But there is no warrant for the assumption that the differential in fees bears any relation to this difference in cost, nothing to indicate that it 'would merely compensate' for the added enforcement burden. Indeed the Tax Commissioner and his Special Deputy Enforcement Officer specifically disclaimed any.

knowledge of the dollar cost of enforcement. . . . *Constitutional issues affecting taxation do not turn on even approximate mathematical determinations. But something more is required than bald assertion to establish a reasonable relation between the higher fees and the higher cost to the Territory.* We do not remotely imply that the burden is on the taxing authorities to sustain the constitutionality of a tax. But where the power to tax is not unlimited, validity is not established by the mere imposition of a tax. In this case, respondents negatived other possible bases raised by the pleadings for the discrimination, and the one relied on by the Commissioner, higher enforcement costs, was one as to which all the facts were in his possession. Respondents sought to elicit these facts by interrogatories and cross-examination without avail. Under the circumstances we think they discharged their burden in attacking the statute." (Italics ours.) [6]

In the *Pérez* case we rejected the contention that discriminatory rates of taxation such as those involved herein ran afoul of the due process clause of § 2 of the Organic Act. We said at pp. 336–8:

"In approaching the problem of determining whether the classification made by the Legislature was arbitrary and capricious, we must bear in mind that the due process clause ' "was not intended to compel the State to adopt an iron rule of equal taxation" . . .' and that 'the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes. The burden is on the one attacking the legislative enactment to negative every conceivable basis which might support it.' *Madden* v. *Kentucky*, 309 U.

---

[6] In the *Mullaney* case, decided in 1952, the Supreme Court overruled *Haavik* v. *Alaska Packers Assn.*, 263 U. S. 510, and held that the privileges and immunities clause found in Art. IV, § 2 of the Constitution of the United States applied to Alaska. In its discussion of this problem, the court calls attention to the very question before us. It says at p. 419–20, footnote 2:

"In 1947, Congress amended the Organic Act of Puerto Rico to provide: 'The rights, privileges, and immunities of citizens of the United States shall be respected in Puerto Rico to the same extent as though Puerto Rico were a State of the Union and subject to the provisions of paragraph 1 of Section 2 of Article IV of the Constitution of the United States.' 61 Stat. 772, 48 U.S.C. § 737. In his statement explaining the

S. 83, 88; *Rivera v. Buscaglia,* 146 F.(2) 461, 465 (C.C.A. 1st., 1944). See *Porto Rico Telephone Co.* v. *Tax Court,* [68 P.R.R.] p. 144.

"This burden has not been sustained here. On the contrary, on the issue of higher rates of taxation, as the Circuit Court of Appeals pointed out in a somewhat similar situation in *South Porto Rico Sugar Co.* v. *Buscaglia,* [154 F. 2d 96], p. 100, the 'purpose of the classification may well be to facilitate the administration of the tax laws'. For example, expenses of collection may be greater for nonresidents; or it may be difficult, if not impossible, to bring a nonresident within the jurisdiction of the local courts. 'In addition... [a resident] is more likely, through taxes paid by [his] employees and through other taxes [such as excise taxes] ... to contribute more to the support of the government that protects the sources from which [his] income is derived than' nonresidents. *South Porto Rico Sugar Co.* v. *Buscaglia, supra,* p. 101 (matter in brackets ours).

"A resident small taxpayer paid a 10 per cent tax and was entitled to a personal exemption and credits for dependents; a similar nonresident paid a 28 per cent tax without the exemption and credits. The difference in the amount of the tax in the lower brackets is considerable. This particular taxpayer is being required to pay $1,121.67; if she were a resident she would pay only $120.60. But when the Act is read as a whole it is clear that she and others similarly situated have not been singled out as objects of hostile and oppressive discrimination. In addition to the possible reasons already noted for this classification, the Legislature for reasons of administrative convenience may have undertaken to solve the vexatious problem of taxation of income of nonresidents from sources within Puerto Rico by imposing a flat rate of tax instead of the progressive rates which apply to residents. ...

---

bill, Senator Butler, the manager of the bill, said, 'Congress has not expressly extended the Constitution to Puerto Rico, as it did in the case of Alaska and Hawaii, and the committee considered it advisable to bring Puerto Rico expressly within the operation of the comity clause so as to leave no doubt that there may be no discrimination against citizens of the United States who are not residents of Puerto Rico.' 93 Cong. Rec. 10402. The report of the Senate Committee on Public Lands expressed dissatisfaction that 'Legislation in Puerto Rico has discriminated against nonresident American citizens.' S. Rep. No. 422, 80th Cong., 1st. Sess. 4."

Article IV, § 2, par. 1 of the Federal Constitution provides that "The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States."

"Nonresident small taxpayers undeniably suffer to some extent from this administrative device; on the other hand, except for denial of a personal exemption and credits for dependents, nonresident taxpayers with net incomes from sources within Puerto Rico in excess of $25,000 are actually favored over resident taxpayers with net incomes exceeding $25,000. We cannot say that the over-all picture shows hostile and oppressive discrimination against nonresidents, and that the taxpayer has negatived every conceivable basis that might support the classification. On the contrary, the Legislature in the exercise of its discretion and in the light of practical considerations has, just as in the case of progressive rates for residents, evolved 'an equitable method of distributing the burdens of government ...'. *N. Y. Ex. Rel. Cohn* v. *Graves*, 300 U. S. 308, 313.

"The question remains as to the personal exemption and credits for dependents. As a nonresident presumably does not incur personal living expenses in Puerto Rico, it is not capricious to deny him a personal exemption. This same reason applies to denial of credits for dependents, with the additional factor that it might be difficult, if not impossible, for the Treasurer to check the accuracy of returns claiming credits for dependents of nonresidents."

We adhere to the foregoing views as expressed by us in the *Pérez* case. Indeed, they are now binding on us in view of the fact that the Court of Appeals stated in the *Ahumada* case that it is "in substantial agreement with the views expressed" in the *Pérez* case. *Buscaglia* v. *Ahumada, supra,* p. 776; see footnote 2 of this opinion. However, this case involves not the due process or the equal protection clause but the privileges and immunities clause, which was not a part of our Organic Act when the *Pérez* case arose. And the privileges and immunities clause establishes a more precise and more exacting test than the due process or equal protection clause. See *Anderson* v. *Mullaney*, 191 F.2d 123, 132–34 (C.A. 9, 1951), affirmed in *Mullaney* v. *Anderson, supra.* It is true, as pointed out in *Toomer* v. *Witsell, supra,* at p. 396 that the "privileges and immunities clause is not an absolute", and at p. 399 that nonresidents may be charged "a differential

which would merely compensate the State for any added enforcement burden they may impose . . ." But the *Toomer* case also indicates that the privileges and immunities clause "does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that they are citizens of other States." And "something more is required than bald assertion to establish a reasonable relation between the higher [taxes] and the higher cost" of collection of income taxes from nonresidents.

■■ The parties stipulated that Antonio Laloma, Jr., Director of the Income Tax Bureau of the Treasury Department, if called as a witness, would have testified as follows:

"He is a certified public accountant and is the Director of the Income Tax Bureau of the Treasury Department of Puerto Rico. He has held this post for five years, having previously been Assistant Director and employee of the said Bureau for six years.

"As such Director, and previously as Assistant Director and employee, he knows the problems confronting the government of Puerto Rico in the imposition and collection of income taxes. Some of the legislative measures enacted to solve these problems are originally proposed by him to the Treasurer of Puerto Rico, who undertakes to obtain their approval by the Legislature.

"It is impractical and difficult for the government of Puerto Rico to collect taxes from nonresidents at the same progressive rates, and to grant them the same credits and deductions which exist at this time in Puerto Rico for residents. This is so because, in order to avoid the evasion of the payment of taxes by nonresidents, they must be collected by the withholding process, as it would be almost impossible to collect taxes in the different jurisdictions where these people reside.

"In the withholding process it would be difficult to compute the normal tax granting the credits and deductions which are given at present to residents. It would be equally difficult, and in many cases even impossible, to compute the surtax, granting the said credits and deductions, and applying the corresponding progressive rate. This would be especially so in all those cases

in which the nonresident received income through two or more agents in Puerto Rico, which would require the grouping or adding of all the said income in order to grant only once the credits and deductions permitted by law, thus avoiding such grants in two or more cases to which the taxpayer had no right, and in order to compute the correct surtax on the basis of the applicable corresponding rate.

"One of the reasons for approving legislation imposing a flat rate, without certain personal credits, for nonresidents, was the difficulty and impracticability—in many cases the impossibility—already noted, of collecting income taxes from nonresidents at the same rates and in the same manner as for residents."

In his testimony Mr. Laloma makes no attempt to meet one of the tests laid down in the *Toomer* and *Mullaney* cases that under the privileges and immunities clause rates of taxation which discriminate against citizens of a State of the Union are justified if there is a reasonable relation between the higher taxes and the higher costs of collection from nonresidents. He gives no figures whatsoever, either general or detailed, to demonstrate that the considerably higher taxes imposed on nonresidents with comparatively modest incomes [7] from sources within Puerto Rico are justified by the costs of collection thereof. On the contrary, his testimony in substance is that withholding at the source is a necessary device for collection of income taxes on nonresidents; that under the withholding process a nonresident cannot be granted the same deductions and credits as residents because he would obtain such deductions and credits

---

[7] The fact that the flat 29% tax on a nonresident results in his paying less taxes than a resident if his taxable income exceeds $25,000 is a factor in showing that due process was not violated, *Buscaglia, Treasurer* v. *Tax Court, Pérez Vahamonde, Intervener, supra*, p. 338. But, for purposes of the privileges and immunities clause, an illegal discrimination against some nonresident citizens of other States is not cured by discrimination in favor of another group of nonresidents.

We note in passing that the amount of income at which the flat rate of 29% becomes more favorable for a nonresident varies, depending on the year involved and his personal status.

more than once in those cases where he received income from two or more sources within Puerto Rico; and that in the same way, withholding would not fit a nonresident into the proper bracket for surtax purposes if he had income from two or more sources within Puerto Rico.

In many instances, it would be difficult, if not impossible, to collect income taxes from nonresidents in the absence of a provision for withholding the tax at the source. Accordingly, an income tax statute may validly provide that withholding provisions shall apply exclusively to nonresidents. *Travis* v. *Yale & Towne Mfg. Co., supra,* p. 76. We therefore see no objection to Mr. Laloma's statement that the withholding provision was a necessary device for collection of the tax on nonresidents. [8]

However, we cannot agree that the flat 29% rate imposed on nonresidents is equally justified. Mr. Laloma asserts that under the withholding process deductions and credits cannot be allowed to nonresidents because they would be taken more than once where a nonresident received income from two or more sources within Puerto Rico. But this problem apparently could be averted by providing that the tax on nonresidents shall be withheld at the source by the withholding agents at the normal and surtax rates for residents without deductions or credits, until the taxpayer files a return at some later date which discloses his income from all sources within Puerto Rico and in which he takes the same deductions and credits to which residents are entitled. *Cf.* § 19 (f) of the Act as amended by Act No. 433 of 1947. [9]

---

[8] Mr.Laloma did not say that the cost of collecting taxes is greater under the withholding system than under the regular method; indeed, it occurs to us that, from the government's point of view, withholding may be more efficient and inexpensive than the ordinary method. A bill has been enacted by the House of Representatives and is pending in the Senate which adopts withholding as a method of collecting income taxes on salaries paid to residents. Section 141 of House Bill No. 935.

[9] Section 19 (f) provides as follows: "A nonresident individual not a citizen of Puerto Rico shall receive the benefit of the deductions and credits allowed in this title only by filing or causing to be filed with the

A slightly higher tax for nonresidents under such a system would be valid if it were reasonably related to the additional cost of operating it.

Mr. Laloma also stated that, once withholding is adopted for nonresidents, it is difficult, if not impossible, to apply the progressive surtax to nonresidents who receive income from two or more sources in Puerto Rico. This does present a substantial problem. However, no figures were presented by Mr. Laloma, the man with "all the facts . . . in his possession", [10] as to how many persons in the past have had from more than one source in Puerto Rico items of income which, if added together, would put them in a surtax bracket. But assuming *arguendo* that the problem exists in a substantial number of cases, we fail to see why a system of requiring a return by a nonresident disclosing all the facts and calculating his tax on the same normal and surtax basis as a resident would not be feasible in most cases. A nonresident who failed to make a return or to pay the proper surtax could be effectively reached through his income from Puerto Rican sources in succeeding years. We recognize that this would not be possible in the case of a nonresident who did not receive income from Puerto Rican source in a succeeding year. Again the figures of how frequently the

Treasurer a true and accurate return of his total income received from all sources in Puerto Rico, in the manner prescribed in this title, including therein all the information which the Treasurer may deem necessary for the calculation of such deductions and credits; *Provided,* That there shall be levied, collected and paid for each taxable year on the net income (after the deduction fixed by this title has been allowed) received by a nonresident individual, who is not a citizen of Puerto Rico, from sources located within Puerto Rico, a normal tax of twenty-nine (29) per cent on such net income. *Provided, further,* That no personal exemption or credit shall be allowed to nonresident individuals who are not citizens of Puerto Rico, and that deductions allowed to these individuals shall not exceed ten (10) per cent of their gross income..."

As we pointed out in the *Pérez* case at p. 330, footnote 4, The Treasurer has apparently acquiesced in the decision of the former Tax Court in *Joglar* v. *Treasurer*, 1 D.T.C. 311, 321, that the 10% limitation on general deductions found in § 19 (f) is invalid.

[10] *Mullaney* v. *Anderson, supra,* pp. 418–19.

latter situation has occurred are in the possession of the government but are not in the record. To take care of this contingency, withholding of the income of all nonresidents might be fixed at a higher rate, with a provision for refund where the subsequent return of the nonresident disclosed that he was not subject to surtaxes. [11] Finally, the cases now pending before us seem to indicate that the problem of surtaxes is comparatively rare. Apparently, in most instances the income of non-residents from Puerto Rican sources is so small that if they were taxed on the same basis as residents they would pay (1) no tax at all, (2) only the normal tax, or (3) a small surtax. What the Legislative Assembly really tried to do was to tax such small incomes at 29%, although in the process it gave a windfall to the presumably rare nonresident taxpayer whose income exceeds $25,000 a year. That it cannot do under the privileges and immunities clause.

We have discussed the possible solutions of the problems of deductions, credits and surtaxes of nonresidents in order to demonstrate that there may be ways of getting around the difficulties envisaged by Mr. Laloma. These alleged difficulties do not seem to have disturbed the members of the House of Representatives when they enacted House Bill No.

[11] House Bill No. 935, now pending in the Senate after approval by the House of Representatives, changes the existing law and taxes residents and nonresident United States citizens on the same basis for purposes of rates of taxation, personal exemptions, and credits for dependents. Pressumably the Problems raised by Mr. Laloma have been substantially solved through provisions for withholding and deferred returns. See § § 11, 12, 25, 116, 119, 131, 141, 143, 211, 212, 213, 411(a)19 of House Bill No. 935. On January 18, 1953 a letter appeared in the New York Herald Tribune protesting against the provisions of our Act imposing a 29% tax on dividends and interest paid to nonresidents. The Secretary of the Treasury wrote a letter, dated February 18, 1953, in reply thereto which appeared in the same newspaper on February 27, 1953. The Secretary's letter said in part that "... at the present time the Puerto Rican Legislature has under consideration a bill reducing the tax on such payments to the same rate paid by residents of Puerto Rico. The rate provided by the bill is a 7 per cent normal tax and a surtax starting with 5 per cent."

935, now pending in the Senate. See footnote 11. In any event, even if the solutions proposed herein are impractical or difficult, the Legislative Assembly is not thereby justified in taxing nonresidents at a higher rate than residents. The teaching of the *Toomer, Mullaney* and *Travis* cases is that in the context of this case the principal justification for taxation of nonresidents at a higher rate than residents is the higher cost of collection from nonresidents. But the strict mandate of the privileges and immunities clause does not yield to the "bald assertion" by Mr. Laloma that it is difficult or impossible to provide for accurate withholding where the income of nonresidents comes from more than one source within Puerto Rico. Since we are convinced that the flat 29% rate on all nonresidents has no reasonable relation to the question of the higher cost of collection from nonresidents and no other valid reason therefor appears in the record, we are constrained to hold that, to the extent that the Income Tax Act taxes nonresident citizens of a State of the Union at a higher rate than it taxes residents and denies them personal exemptions and credits for dependents granted to residents, it abridges the privileges and immunities clause of § 2 of the Organic Act.

There is one procedural point which requires our attention. The plaintiff has filed a motion asking us to take into consideration the testimony of Mr. Laloma in the Superior Court in the case of *Leticia Besosa Quiñones* v. *Secretary of the Treasury*, Case No. I–155. Attached to this motion is the testimony of Mr. Laloma in the *Besosa* case as certified by the court reporter. In that case Mr. Laloma stated on the witness stand as a witness for the plaintiff that when he made the statements in the stipulation in the *Postley* case, "he was trying to justify, not the rate, but the method of collecting the tax." He then testified as follows: "Q.— Then your reasons are directed exclusively to the method of collecting the taxes? A.— I think so. Q.— Could you

explain to the Court, if you know, why that rate was fixed at 29%? A.— That is an arbitrary rate. Q.— Then I ought to conclude from your answer, that since this is an arbitrary rate, you do not know if that rate has any relation to the difficulties in the collection of those taxes? A.— I believe that it has no relation. The rate could be 50% or 36% ..."

On cross-examination by counsel for the Secretary of the Treasury, the witness testified that the 29% rate was not established because of the difficulties of collection. When asked why it was established, he replied "I believe it is an arbitrary rate; it could have been 27, 28 or 30%." When asked again if the difficulty of collection from nonresidents has anything to do with the difference in the two rates, he replied that "It has nothing to do with it." He was then asked "In a case like this in which the taxpayer had a net income of approximately $3,000, of taxable income ... In a case like this, in which she, as a nonresident has had to pay more than she would have to pay if she were treated as a resident, do the difficulties of collection, and the difficulty of checking the credits as well as the deductions, etc., have anything to do with the difference in rate? A.— It has nothing to do with it."

The Secretary of the Treasury objects to our taking the testimony of Mr. Laloma in the *Besosa* case into consideration on the ground that it was presented in another case after the present case had been decided by the Superior Court. He asserts that the cases cited by the plaintiff in support of his motion are not applicable. We find it unnecessary to rule on this motion. We assume without deciding that we cannot consider Mr. Laloma's testimony in the *Besosa* case in the instant case. However, even without this testimony we have already concluded that the withholding provisions of the Act as such are valid as a collection device even though they are applied exclusively to nonresidents; but the fact that with-

holding is necessary to collect taxes from nonresidents does not justify an arbitrary rate which in the lower brackets is considerably higher for a nonresident citizen of a State of the Union than for a resident, in the absence of (1) proof tending to show a reasonable relation between the higher rate and the costs of collection and (2) any other valid reason for such higher rates of taxation. The difficulty cited by Mr. Laloma in his stipulated testimony in the present case —the problem of allowing deductions and credits to a nonresident and fitting him into the proper bracket where he has two or more sources of income within Puerto Rico—has no bearing on added costs of collection and must be solved in some way other than fixing an *arbitrarily* higher rate of taxation for *all* nonresidents. [12]

We have already seen that the privileges and immunities clause is not an absolute and that higher costs of collection —as well as other reason—may under appropriate circumstances justify the imposition of taxes which are higher for nonresidents than for residents. But we find neither higher costs of collection—nor any other reason therefor—in this case. The trial court gave two reasons other than higher costs of collection which in its view justified the imposition of higher income taxes on nonresidents than on residents. We are unable to agree with this view of the trial court.

■ The first additional reason of the lower court was the alleged evils of absentee ownership. It is not for us to

---

[12] The Secretary of the Treasury does not contend that the result here is affected by the following: (1) in Puerto Rico our Income Tax Act is in most instances in lieu of the Federal Act, whereas in the States their local Acts supplement the Federal Act; (2) under certain circumstances a nonresident may credit against his Federal income tax all or part of the income tax paid by him under our Act. The Secretary did call attention to this second point in his letter to the New York Herald Tribune, see footnote 11. In this letter the Secretary said that "...most [nonresident] investors would be paying a higher Federal tax for said income [dividends and interest earned by nonresident individuals from sources within Puerto Rico] and would be able to deduct from their Federal tax the amount paid to the Government of the Commonwealth of Puerto Rico..." (Matter in brackets ours.)

say whether these alleged evils previously existed or still exist. We assume without deciding that these evils did exist at the time the Sections assailed were enacted and that the Legislative Assembly imposed a higher income tax on non-residents as one of the means designed to eradicate them. The short answer to this contention is that the privileges and immunities clause stands in the way of a tax measure with such a purpose. Judge Cardozo makes this clear in *Smith* v. *Loughman, supra,* at p. 755:

"The state does not establish the validity of this act by showing that from certain points of view or in aid of certain purposes a classification discriminating between residents or nonresidents has a basis, not wholly illusory, in policy or reason. There is no occasion to inquire whether such a showing would suffice if we were dealing with the equal protection clause of the Fourteenth Amendment, and nothing else. We deal in fact with something more. 'The power of a state to make reasonable and natural classifications for purposes of taxation is clear and not questioned; but neither under form of classification nor otherwise can any state enforce taxing laws which in their practical operation materially abridge or impair the equality of commercial privileges secured by the federal Constitution, to citizens of the several states.' Chalker v. Birmingham & N. W. Ry. Co., 249 U. S. 522, 526, 39 S. Ct. 366, 367 (63 L.Ed. 748). Classification may be supported by many considerations of expediency or fairness and, none the less, may be illegal if it denies to the citizens of any state the privileges and immunities that belong to citizens of another. To put it differently, equality in such circumstances is itself the highest policy, to which other policies must bow. The Constitution so commands. Few of its commands, if any, have had an influence more profound upon the attainment and preservation of the unity of the nation. *Paul* v. *Virginia,* 8 Wall. 168, 180, 19 L. Ed. 357; *Travis* v. *Yale & Towne Mfg. Co.,* 252 U. S. 60, 79, 40 S. Ct. 228, 64 L. Ed. 460. *Cf. Hanover Fire Ins. Co.* v. *Carr,* 272 U. S. 494, 47 S. Ct. 179, 71 L. Ed.—"

It might be added that to assert that absentee ownership is one of the evils which justifies discriminatory taxation despite the privileges and immunities clause is a contradiction

in terms. That is to say, absentee ownership is inseparable from rather than independent of nonresidence in Puerto Rico. It follows that such nonresidence cannot be made the basis for discrimination when it is the very thing protected by the privileges and immunities clause.

The other reason adduced by the trial court to sustain the tax falls into the same category. The court said that unlike the nonresident, a resident "normally reinvests his income here because he lives here and pays into the public treasury other direct and indirect taxes, and enriches our economy." The court also pointed to the public services furnished by the state which protect the property and instruments of production of nonresidents. Once more these arguments, however plausible they may be, are met by the insurmountable obstacle of the privileges and immunities clause as indicated by the foregoing quotation from *Smith* v. *Loughman, supra.* The reasons of policy adduced by the trial court obviously do not bring the discrimination in this case within the rule that such action is proper where "noncitizens constitute a peculiar source of the evil at which the statute is aimed." *Toomer* v. *Witsell, supra,* p. 398. To so hold would be virtually to nullify the privileges and immunities clause. [13]

The privileges and immunities clause of the Organic Act was approved while the *Pérez* case was pending in this Court and the *Ahumada* case was pending in the Court of Appeals for the First Circuit. The report of the Senate Committee on Public Lands states that the addition of the privileges and immunities clause to the Organic Act ". . . will make Puerto Rico subject to paragraph 1 of section 2 of article

___

[13] "We do not remotely imply that the burden is on the taxing authorities to sustain the constitutionality of a tax. But where the power to tax is not unlimited, validity is not established by the mere imposition of a tax." *Mullaney* v. *Anderson, supra,* p. 418. As in the *Mullaney* case, for the reasons already given, we are satisfied from the record before us and the terms of the Act that the plaintiff has met the burden of showing that the Sections in question violate the privileges and immunities clause of the Organic Act. See *Walker* v. *Tax Court,* 72 P.R.R. 651.

4 of the Federal Constitution, commonly known as the comity clause. The purpose of this addition is to assure that citizens of the United States not residing in Puerto Rico will have the same treatment in Puerto Rico as local residents. This right is guaranteed by the Constitution to citizens of the various States but has been held not to apply to Puerto Rico. Legislation in Puerto Rico has discriminated against nonresident American citizens." See footnote 6 for a partial quotation of this report in the *Mullaney* case.

We know of no other legislation to which the Committee could have been referring except the Sections of the Income Tax Act involved herein. We think it is clear beyond peradventure that the Act of Congress was aimed at these Sections of our Act. The Committee and Senator Butler did not state that discriminatory taxation would be valid if found to be necessary to avoid undue absentee ownership or other alleged social evils. They said in effect that the present discrimination in our Income Tax Act could no longer continue once the privileges and immunities clause was included in the Organic Act.

Generally speaking, the Federal income tax laws do not apply to Puerto Rico. In this and in other fields of taxation Puerto Rico had under the Organic Act and under the compact with the United States now has wider taxing powers than the States of the Union in partial compensation for its lack of representation in Congress. *Rivera* v. *Buscaglia*, 146 F.2d 461 (C.A. 1, 1944); *Buscaglia* v. *Ballester*, 162 F.2d 805 (C.A. 1, 1947), reversing *Ballester Hermanos* v. *Tax Court*, 66 P.R.R. 531.[14] However, this wider taxing power does not prevail insofar as the privileges and immunities

---

[14] Despite the broad powers of taxation vested in the Legislature of Puerto Rico by the statute involved in *Buscaglia* v. *Ballester, supra,* Congress was careful to add thereto the following: *"Provided* that no discrimination be made between the articles imported from the United States or foreign countries and similar articles produced or manufactured in Puerto Rico." 48 U.S.C. § 741(a).

clause is concerned. The latter clause applies in Puerto Rico in the same way as it applies in the States of the Union both under the Organic Act as of August 5, 1947 and under the compact between Puerto Rico and the United States. 64 Stat. 319; 66 Stat. 327. These Sections of the Income Tax Act cannot continue to remain in effect in their present form in the light of the applicability to Puerto Rico of the privileges and immunities clause and the cases interpreting Art. IV, § 2, par. 1 of the Constitution of the United States.

We hold that §§ 12, 13, 18 and 19 of the Income Tax Act, insofar as they provide for (1) a 29% normal tax on non-residents who are citizens of a State of the Union as against a 7% normal tax on residents, and (2) the denial to such nonresident citizens of personal exemptions of $800 and $2,000 and credits for dependents of $400 granted to residents, and thereby establish higher rates of taxation for such nonresidents than for residents, violate the privileges and immunities clause of § 2 of the Organic Act. These Sections are therefore invalid to that extent as applied to income received or earned subsequent to August 5, 1947.[15]

---

[15] This case does not involve the question of whether the Act of Congress of August 5, 1947 has the same effect in Puerto Rico as the privileges and immunities clause of § 1 of the Fourteenth Amendment has on the legislative powers of the States. That problem could arise only if a case arose involving a citizen of the United States who is not a citizen of a State. We would then be required to determine: (1) whether the Act of August 5, 1947 operates in the same way in Puerto Rico as § 1 of the Fourteenth Amendment operates for the States; (2) assuming the first question is answered in the affirmative, whether § 1 of the Fourteenth Amendment extends the same protection in the problem before us as Art. IV, § 2, par. 1 of the Federal Constitution. Compare *Buscaglia, Treasurer* v. *Tax Court, Pérez Vahamonde, Intervener, supra,* p. 333 with *Buscaglia, Treas.* v. *Tax Court, Ahumada, Intervener, supra,* p. 924; *Madden* v. *Kentucky,* 309 U.S. 83, overruling *Colgate* v. *Harvey,* 296 U.S. 404; dissenting opinion in *Colgate* v. *Harvey* at pp. 443–450; *Hague* v. *C.I.O.,* 307 U.S. 496, 520, footnote 1; *Edwards* v. *California,* 314 U.S. 160, 177–186 (concurring opinions); *Adamson* v. *California,* 332 U.S. 46; McGovney, *Privileges or Immunities Clause, Fourteenth Amendment,* 4 Iowa L. Bull. 219, as reprinted in 2 *Selected Essays on Constitutional Law* 402; Howard, *The Privileges and Immunities of Federal Citizenship and Colgate v. Harvey,* 87 U. Pa.L.Rev. 262.

The result we have reached does not require us to hold that the income tax on a nonresident is wholly void and that he is required to pay no tax. On the contrary, as in the case of a resident alien, our holding does not vitiate the entire tax imposed on a nonresident. He is entitled only to the same treatment as citizens of Puerto Rico who reside here. His tax should therefore be calculated at the same rate as that of resident citizens. *Ballester* v. *Court of Tax Appeals*, 61 P.R.R. 460, 483, affirmed in *Ballester-Ripoll* v. *Court of Tax Appeals of P. R.*, 142 F.2d 11, 18–9 (C.A. 1, 1944);[16] *San Juan Trading Co.* v. *Sancho*, 114 F. 2d 969, 975 (C.A. 1, 1940); *South Porto Rico Sugar Co.* v. *Buscaglia*, 154 F.2d 96, 99 (C.A. 1, 1946); *Anderson* v. *Mullaney, supra,* p. 133, affirmed in *Mullaney* v. *Anderson, supra. Contra, State* v. *Berntsen, supra,* with which we cannot agree on this point.

The judgment of the Superior Court will be reversed and a new judgment will be entered directing the Superior Court to order the Secretary of the Treasury to make a refund to the plaintiff of the portion of the sums withheld at the source and paid to the Secretary which is in excess of the amount of the tax the plaintiff would be required to pay if he were taxed on the same basis as a resident citizen of Puerto Rico.

Mr. Justice Negrón Fernández and Mr. Justice Sifre did not participate herein.

---

[16] No appeal was taken from our decision holding invalid the imposition of a higher rate of taxation on the income of resident aliens than on the income of resident citizens. 61 P.R.R. 460, 478–83; 142 F.2d 11, 18.